519 S.E.2d 577

The STATE, Appellant,

v.

Ui Sun HUDSON, Respondent.

No. 3015.

Court of Appeals of South Carolina.

Heard June 8, 1999.

Decided June 21, 1999.

Rehearing Denied Aug. 28, 1999.

238

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, and Assistant Deputy Attorney General Salley W. Elliott, all of Columbia; and Solicitor David Price Schwacke, of North Charleston, for appellant.

John D. Elliott; and Assistant Appellate Defender Robert M. Pachak, of South Carolina Office of Appellate Defense, both of Columbia; and D. Ashley Pennington, of Charleston, for respondent.

Amicus Curiae: Lesly Ann Bowers, of Protection & Advocacy for People with Disabilities, Inc., of Columbia.

ANDERSON, Judge:

The State appeals from that portion of a Circuit Court order which authorizes unsupervised leave from the South Carolina State Hospital by Ui Sun Hudson where the judge found Hudson in need of "continued" hospitalization pursuant to S.C.Code Ann. § 17–24–40.   We affirm in part and vacate in part.

### FACTS/PROCEDURAL BACKGROUND

In a 1995 bench trial, a Circuit Court judge found Hudson not guilty by reason of insanity (NGRI) on four counts of assault and battery with intent to kill.   The parties have stipulated to the following underlying facts:

At approximately 3:30 p.m. on April 1, 1995 in Northwoods Mall, ... Charleston County, Linda Derbyshire was walking her two (2) children in a double stroller near the Easter Bunny display in the center of the Mall. Her sixteen (16) month old baby girl, Nikki was asleep in the back seat and her three (3) year old son Dane was riding in the front.

As she passed by [Hudson], Mrs. Derbyshire noticed [Hudson] staring fiercely at her son, Dane. Suddenly, [Hudson] lunged at Dane with a pair of scissors in her hand. [Hudson] attempted to stab Dane in his eyes and face and was able to inflict a serious wound to Dane's left cheek before Mrs. Derbyshire could stop [Hudson]. And although Mrs. Derbyshire was able to position herself between [Hudson] and her children, [Hudson] overpowered and reached around Mrs. Derbyshire and stabbed Nikki in the left eye. Doctors at the Medical University of South Carolina were able to save Nikki's left eye; but she will never be able to see out of it, and there is only a fifty (50%) percent chance she will be able to keep it. Mrs. Derbyshire received severe lacerations to her arm during the assault.

Andrew Imholt and his 7 year old son, Isaac, were passing by at the time of the attack. At first, Mr. Imholt thought the two women were fighting about disciplining the children, but when Mr. Imholt saw [Hudson] stab Nikki in the eye, he grabbed [Hudson] and attempted to pull her back. [Hudson] spun away from Mr. Imholt's grasp and went after his son. Mr. Imholt saw [Hudson] grab his son Isaac by the shoulder and attempt to stab Isaac in the eye, but Mr. Imholt deflected [Hudson's] blow and Isaac turned his head in time to receive only a cut to his right cheek. Mr. Imholt, who was also cut on his hand during the assault, was again able to grab [Hudson] from behind, and John Hurt was able to pry the scissors from her hand. Mr. Hurt, Mr. Imholt, and others were able to subdue [Hudson] until Mall security and the police arrived.

The trial judge ordered Hudson committed to the State Hospital for a mental evaluation. The court's order mandated the evaluation be completed within one hundred twenty days so the Chief Administrative Judge could hold a hearing to determine whether Hudson required hospitalization. The mental health authorities charged with completing the evaluation and reporting its results to the court failed to timely comply.

While committed to the state hospital for her mental evaluation, Hudson participated in the Allan Project, an NGRI treatment program operated by the Department of Mental Health. The program allows an NGRI defendant to progress

through a series of seven levels, each affording the defendant an increasing degree of independence while decreasing the level of supervision. A defendant who reaches level seven is deemed ready for discharge.

On April 25, 1997, the court held a hearing to review Hudson's status. At the time of the hearing, Hudson, a diagnosed paranoid schizophrenic, had achieved a level four status and could travel unsupervised on public transportation to and from a state-sponsored work site. She also could request passes to spend unsupervised periods of time in the community while accompanied by another NGRI defendant or "buddy." Hudson was allowed to take money she earned with her during her unsupervised excursions from the hospital.

Following the hearing, the Chief Administrative Judge issued an order finding Hudson "in need of further hospitalization." The judge ruled the South Carolina State Hospital violated S.C.Code Ann. § 17–24–40 (1985) by allowing unsupervised leave by Hudson without prior notice to and approval from the Chief Administrative Judge. He concluded, however, that Hudson's participation in the Allan Project proved beneficial. The court held the state hospital could continue to release Hudson unsupervised into the community in accordance with her level four status. The judge further ordered that, prior to Hudson's advance to level five and the concomitant privileges, the state hospital must follow the statutory procedures and obtain approval from the Chief Administrative Judge. Finally, the judge instructed the state hospital to review the privileges granted to an NGRI defendant at level four "as prior court approval is required before patients are released into the community unsupervised."

The state's Attorney General, Charles M. Condon, brought a declaratory and injunctive action to prohibit the Department of Mental Health's release of NGRI defendants through "buddy" passes, work passes, and community living passes until the Chief Administrative Judge ordered the release of these defendants pursuant to the procedures of § 17–24–40. This action resulted in a consent order requiring the Department of Mental Health to obtain approval from the appropriate Chief Administrative judge prior to allowing NGRI defendants to take unsupervised leave in any form from hospital grounds.

The order prohibited the Allan Project's use of "buddy passes." The consent order provided that settlement of the declaratory and injunctive action did not affect the State's appeal in the present case.

## *ISSUE*

Did the trial court err in authorizing unsupervised leave from the state hospital by Hudson where the judge found Hudson in need of "continued" hospitalization?

## *LAW/ANALYSIS*

### I. Effect of the 1997 Consent Order in *State ex rel. Condon v. South Carolina Department of Mental Health*

Hudson contends the State's consent order with the Department of Mental Health renders the issue in this appeal moot. We disagree.

A close reading of the consent order in *State ex rel. Condon v. South Carolina Department of Mental Health* reveals the issue in the case *sub judice* was specifically preserved for this appeal. The language of the order is instructive and edifying:

[T]he parties in this case disagree as to the interpretation and requirements of S.C.Code Ann. § 17–24–40 (Law. Co-op. 1976) dealing with NGRI defendants and adamantly defend their positions on the legal requirements of this statute....

. . . .

The settlement of this case does not prohibit the State from taking a position in future litigation on the meaning of the words *confinement, hospitalization,* and *commitment* contained in section 17–24–40 with regard to NGRI defendants and does not affect the State's appeal of *State of South Carolina v. Ui Sun Hudson* (emphasis added).

The consent order did not, nor could it, resolve the issue on appeal in this case: whether a Circuit Court Chief Administrative Judge can authorize the unsupervised leave of an NGRI defendant the judge finds is in need of "continued" hospitalization under S.C.Code Ann. § 17–24–40 (1985). While the consent order mandates the Department of Mental Health receive

prior court approval before releasing NGRI defendants on unsupervised leave, it does not determine whether the court can actually approve such leave. Even with the approval of a judge, the parties to a lawsuit cannot determine the extent of judicial power under a statute.

## II. Power of Chief Administrative Judge to Authorize Unsupervised Leave By NGRI Defendant Judge Finds in Need of "Continued" Hospitalization

■ The State claims the trial court erred in authorizing unsupervised leave from the state hospital by Hudson where the judge found Hudson in need of "continued" hospitalization pursuant to § 17–24–40. We agree.

According to the State, the Chief Administrative Judge exceeded the powers granted him by the General Assembly under § 17–24–40, which vests the Chief Administrative Judge "with the discretion to determine whether [an NGRI] defendant is in need of hospitalization." *State v. Huiett*, 302 S.C. 169, 173, 394 S.E.2d 486, 488 (1990). Section 17–24–40 provides:

(A) In the event a verdict of "not guilty by reason of insanity" is returned, the trial judge shall order the defendant committed to the South Carolina State Hospital for a period not to exceed one hundred twenty days. During that time an examination shall be made of the defendant to determine the need for hospitalization of the defendant pursuant to the standards set forth in § 44–17–580 of the 1976 Code.

(B) A report of the findings shall be made to the chief administrative judge of the circuit in which the trial was held, the solicitor, the defendant, and the defendant's attorney.

(C)(1) Within fifteen days after receipt of this report by the court, the chief administrative judge of the circuit in which the trial was held shall hold a hearing to decide whether the defendant should be hospitalized pursuant to the standard of § 44–17–580 of the 1976 Code.

(2)(a) If the chief administrative judge finds the defendant not to be in need of hospitalization, he may order the defendant released upon such terms or conditions, if any,

as he shall deem appropriate for the safety of the community and the well-being of the defendant.

(b) In the event the chief administrative judge finds the defendant to be in need of hospitalization, he *shall* order him committed to the South Carolina State Hospital.

(c) If at a later date it is determined by officials of the State Hospital that the defendant is no longer in need of hospitalization, they shall notify the chief administrative judge, the solicitor, the defendant, and the defendant's attorney. Within twenty-one days after the receipt of this notice the chief administrative judge, upon notice to all parties, shall hold a hearing to determine whether the defendant is in need of continued hospitalization pursuant to the standard of § 44–17–580 of the 1976 Code. *If the finding of the court is that the defendant is in need of continued hospitalization, it shall order his continued confinement.* If its finding is that the defendant is not in need of continued hospitalization, it may order the defendant released upon such terms and conditions, if any, as the chief administrative judge shall deem appropriate for the safety of the community and the well-being of the defendant.

(D) Any terms and conditions imposed by the chief administrative judge shall be therapeutic in nature, not punitive. Therapeutic terms shall include, but not be limited to, requirements that the defendant:

(1) continue taking medication for an indefinite time and verify in writing the use of medication;

(2) receive periodic examinations and reviews by psychiatric personnel;

(3) report periodically to the probation office for an evaluation of his reaction to his environment and his general welfare.

(E) The chief administrative judge of the circuit in which the trial was held shall at all times have jurisdiction over the defendant for the purposes of this chapter.

S.C.Code Ann. § 17–24–40 (1985) (emphasis added).

The cardinal rule of statutory construction is to ascertain and effectuate the legislative intent whenever possible. *Strother v. Lexington County Recreation Comm'n,* 332

S.C. 54, 504 S.E.2d 117 (1998); *City of Camden v. Brassell,* 326 S.C. 556, 486 S.E.2d 492 (Ct.App.1997). All rules of statutory construction are subservient to the one that legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in the light of the intended purpose of the statute. *Ray Bell Constr. Co. v. School Dist. of Greenville County,* 331 S.C. 19, 501 S.E.2d 725 (1998). The determination of legislative intent is a matter of law. *City of Sumter Police Dep't v. One (1) 1992 Blue Mazda Truck,* 330 S.C. 371, 498 S.E.2d 894 (Ct.App. 1998).

The legislature's intent should be ascertained primarily from the plain language of the statute. *Stephen v. Avins Constr. Co.,* 324 S.C. 334, 478 S.E.2d 74 (Ct.App.1996). Words must be given their plain and ordinary meaning without resorting to subtle or forced construction which limits or expands the statute's operation. *Rowe v. Hyatt,* 321 S.C. 366, 468 S.E.2d 649 (1996); *City of Sumter Police Dep't, supra.* When faced with an undefined statutory term, the court must interpret the term in accord with its usual and customary meaning. *Strother, supra.*

The terms must be construed in context and their meaning determined by looking at the other terms used in the statute. *Southern Mut. Church Ins. Co. v. South Carolina Windstorm and Hail Underwriting Ass'n,* 306 S.C. 339, 412 S.E.2d 377 (1991). Courts should consider not merely the language of the particular clause being construed, but the word and its meaning in conjunction with the purpose of the whole statute and the policy of the law. *Whitner v. State,* 328 S.C. 1, 492 S.E.2d 777 (1997). *See also Stephen, supra* (statutory provisions should be given reasonable and practical construction consistent with purpose and policy of entire act). In interpreting a statute, the language of the statute must be read in a sense which harmonizes with its subject matter and accords with its general purpose. *Hitachi Data Systems Corp. v. Leatherman,* 309 S.C. 174, 420 S.E.2d 843 (1992); *State v. Baucom,* 334 S.C.371, 513 S.E.2d 112 (Ct.App.1999).

If a statute's language is plain and unambiguous, and conveys a clear and definite meaning, there is no need to employ rules of statutory interpretation and the court has no

right to look for or impose another meaning. *Paschal v. State Election Comm'n,* 317 S.C. 434, 454 S.E.2d 890 (1995); *Brassell, supra.* When the terms of a statute are clear, the court must apply those terms according to their literal meaning. *Holley v. Mount Vernon Mills, Inc.,* 312 S.C. 320, 440 S.E.2d 373 (1994). However, if the language of an act gives rise to doubt or uncertainty as to legislative intent, the construing court may search for that intent beyond the borders of the act itself. *Baucom, supra.* Any ambiguity in a statute should be resolved in favor of a just, equitable, and beneficial operation of the law. *City of Sumter Police Dep't, supra.*

The language of § 17–24–40 is plain and conveys a clear, definite meaning. After the initial evaluation, the Chief Administrative Judge must choose the NGRI defendant's status. Either the defendant is in need of hospitalization and *must* be committed to the state hospital or the defendant is not in need of hospitalization and *may* be released pursuant to any therapeutic conditions the judge elects. *See* § 17–24–40. The statute does *not* grant the Chief Administrative Judge the power to authorize unsupervised leave by an NGRI defendant the judge finds in need of "continued" hospitalization. Thus, the Chief Administrative Judge possesses *no* discretion in this regard.

Although the General Assembly did not define "commitment," the plain meaning of this term, especially when juxtaposed with the other statutory possibility, "release," directs the defendant be *confined* to the supervision of the state hospital. If state hospital officials request a hearing upon their belief the NGRI defendant is no longer in need of hospitalization and the court disagrees with this position, the court "shall order [the NGRI defendant's] continued *confinement.*" § 17–24–40(C)(2)(c) (emphasis added). A defendant with unsupervised leave privileges could not, within the plain meaning of the statute, be considered committed. Indubitably, the statute demonstrates the legislature never envisioned that a committed NGRI patient could be released to societal freedom on unsupervised, albeit temporary, leave from the state hospital.

## CONCLUSION

We hold § 17–24–40 does not empower the Chief Administrative Judge to authorize unsupervised leave by an NGRI

defendant the judge determines needs "continued" hospitalization. Because the Chief Administrative Judge found Hudson in need of "continued" hospitalization, § 17–24–40 mandated the judge commit Hudson to the state hospital. We rule § 17–24–40 requires an NGRI defendant who is in need of "continued" hospitalization be subject to "continued confinement." "Confinement" means the NGRI defendant is housed within the confines of the state hospital. Unsupervised leave of any nature is prohibited while an NGRI defendant is hospitalized. To the extent the Chief Administrative Judge's order permits Hudson to take unsupervised leave from the hospital where she is committed, it is **VACATED.** Accordingly, the judge's order is

**AFFIRMED IN PART and VACATED IN PART.**

CURETON and STILWELL, JJ., concur.