617 S.E.2d 369

**Teresa A. BASS, Employee, Respondent,**

v.

**ISOCHEM and St. Paul Fire & Marine Insurance Co., Appellants.**

**No. 3996.**

Court of Appeals of South Carolina.

Heard May 11, 2005.
Rehearing Denied Aug. 26, 2005.
Decided June 6, 2005.

460

Stanford E. Lacy, of Columbia, for Appellants.

David V. Benson, of Rock Hill, for Respondent.

ANDERSON, J.:

In this Workers' Compensation case, the employer, Isochem Colors, Inc., appeals the circuit court's order reversing the denial of benefits to Teresa A. Bass by the Appellate Panel of the Workers' Compensation Commission. The circuit court reversed on the ground that substantial evidence did not support the Appellate Panel's decision to deny benefits because Bass failed to give timely notice of her accident to Isochem. We affirm in result and remand.

## FACTUAL/PROCEDURAL BACKGROUND

In August of 1999, Bass was diagnosed with carpal tunnel syndrome. After her doctor prescribed Motrin, Bass "didn't have the problem anymore." On November 16, 2000, Bass began working at Isochem as a truck driver. Prior to starting work at Isochem, Bass had a pre-employment physical and was "pronounced fit and able to work." At Isochem, Bass was responsible for delivering large drums of powdered dye weighing between 100 to 500 pounds. This required Bass to load and unload the drums by tilting them on their edge and rolling the drums off of the truck, arm over arm, as she made deliveries. Depending on the number of delivery orders Isochem received, Bass delivered between one and fifty drums per day.

According to Bass, in January of 2001, she was delivering drums of dye to Amble Knitwear in Kings Mountain when she tipped a drum and "had some pain in [her] hand." Bass declared she "first notice[ed] problems with [her] arms when [she was] working for Isochem ... [a]bout January of 2001." Bass did not immediately inform anyone at work of her "problems" because she "thought it would go away." Bass stated she informed her supervisor, Angela Radcliff, of the "problems" "a few months later." Bass admitted she did not remember exactly when she told Radcliff but asserted that she advised Radcliff of her "problems" "on a few occasions." Bass testified:

I told [Radcliff] that moving the drums and all is bothering me. The pain is bothering me. I even told her that my

hands were going numb at night. I told her that my hands, as a matter of fact I was driving and my hands were going numb while I was driving. And I was talking to her on the telephone at that time. And I told her that my hands were going numb then.

Radcliff did not recall Bass mentioning any "problems with her hands or wrists" until November of 2001. Radcliff professed: "[Bass] had come to me and she had said that that night during when she was sleeping that they were going numb and they were, you know, felt like they were asleep. And they were bothering her and hurting her." In the Supervisor's Accident Investigation Report, Radcliff indicated Bass' "Hand/Wrist" injury was reported on December 6, 2001. Bridget Roberge filled out a "Workers' Compensation—First Report of Injury or Illness" form on December 6, 2001. On the form, Roberge noted the "date of injury/illness" and the "date employer notified" was "12/06/01." Roberge further noted the "type of injury/illness" was "carpal tunnel syndrome (CTS)" and the "part of body affected" was the "wrist."

After several months of progressive pain, Bass sought medical treatment from Dr. Donald H. McQueen, III on November 28, 2001. At Dr. McQueen's office, Bass answered questions on the "Patient Medical History Form" in the following manner:

What will we be seeing you for today? *wrist*

. . . .

If this was not the result of an accident, please tell us when your pain started. If you are unsure, please give an approximate date: *approx. 10 mons. ago*

In his medical note from Bass' November visit, Dr. McQueen wrote: "Problem: Pain in both hands with numbness. . . . Has developed pain in both hands." Dr. McQueen diagnosed Bass with bilateral carpal tunnel syndrome and suggested surgery to alleviate her symptoms. Bass underwent a right carpal tunnel release on December 28, 2001 and a left carpal tunnel release on January 28, 2002. In a letter to Bass' attorney dated January 15, 2002, Dr. McQueen opined:

[I] am unable to state that most probably and to a reasonable ... degree of medical certainty that [Bass' work] activities have caused injury to her wrists.

... [A] person with carpal tunnel syndrome would most likely aggravate a pre-existing condition if they performed a strenuous job in a repetitious manner.

It is reasonable to say that Ms. Bass may have aggravated a pre-existing condition.

On January 9, 2002, Bass filed a Form 50 seeking Workers' Compensation benefits for bilateral carpal tunnel syndrome. On the Form 50, Bass alleged:

1.a. The claimant sustained an accidental injury to *Both arms* on *11–28–01 (12a says 12–6–01)* in *York* County, State of *South Carolina.*

1.b. Describe briefly how the accident occurred *Repetitive loading and unloading of drums of powdered dye weighing From 110 through 400 lbs. caused injury to both wrists and arm manifesting itself in the need (See Attachment)*

. . . .

4. At the time of the injury the claimant was performing services arising out of and in the course of employment.

5. Notice of the accidental injury was given to the employer on *11–28–01* in the following manner: *Angela, her supervisor—on various occasions and on 11–28–01.*

Isochem denied the claim on the ground that Bass failed to give timely notice.

In spite of the surgery, Bass continued to have problems. Because of these "complications," Bass was evaluated by Dr. J. Samuel Seastrunk, an orthopedic surgeon, on April 1, 2002. When asked if she told Dr. Seastrunk "about this event in January of 2001," Bass replied: "Yes, sir, I did." Bass testified:

I told [Dr. Seastrunk] that I was at Amble Knitwear in Kings Mountain [in January of 2001] and I tipped a drum and I realized that I had some pain in my hand. Then I told him that the pain got worser [sic] and worser [sic]. And I got to where I just couldn't stand it no more. And I ended up going to Dr. McQueen and he done surgery.

Counsel for Isochem asked Bass: "Is it fair to say then that the pain you were having in your hands, was the first time that you related it to rolling the drums was in January of 2001?" Bass answered: "Approximately that time."

In his medical notes, Dr. Seastrunk stated: "[Bass] relates that sometime in January of 2001 that she injured both wrists when she pulled on a drum and her wrists began hurting her." Dr. Seastrunk opined:

IMPRESSION: 1. Bilateral carpal tunnel syndrome with bilateral carpal tunnel release as a result of Workers Comp injury from repetitive loading and unloading heavy weights.

DISPOSITION AND DISCUSSION:

From the information that I have and in accordance with my evaluation of Ms. Bass today, it is my feeling that the problems she is having with both wrists, that is carpal tunnel syndrome bilaterally, is directly related to the repetitive loading and unloading of drums which seem to be an ongoing process, necessitating her to refer herself to Dr. McQueen on 11–28–01 in which he made the diagnosis of bilateral carpal tunnel syndrome. . . . [I]t is my feeling that [Bass] is impaired to her right upper extremity by at least ten percent 10% as a result of the carpal tunnel syndrome and also to her left upper extremity by at least thirteen percent (13%) relative to the carpal tunnel syndrome and also the area of hard spot in her left palm.

In his deposition, Dr. Seastrunk said Bass described an injury to him that occurred in January of 2001:

She was describing these drums and she apparently was pulling on the drum. I don't know exactly what these drums look like. She probably used a hand dolly or something to maneuver these things and was pulling on a drum, probably trying to get it in better position and she had a feeling of pain, if I recall, in her wrist area. . . . The date of the injury she gives is January 2001.

Dr. Seastrunk reiterated: "My opinion is that [Bass] developed carpal tunnel as a result of the type of activity she was doing."

The Single Commissioner denied Bass' claim for benefits. In the Commissioner's order under "Statement of the Case," the Commissioner declared: "This is a denied carpal tunnel syndrome case." Under "Summary of Evidence," the Commissioner stated:

Bass has a history of carpal tunnel syndrome. On August 31, 1999, she was diagnosed with carpal tunnel syndrome by her family physician, Dr. Steven Oehme. Bass denied any long-term affects [sic] and did not return to Dr. Oehme for follow-up visits. Dr. Oehme's report ... states claimant was diagnosed with bilateral carpal tunnel syndrome, mild, left greater than the right. Dr. Oehme's report indicates Bass should take anti-inflammatories and consider a brace. The report states that, "She agrees."

. . . .

Bass underwent right carpal tunnel release by Dr. McQueen on December 28, 2001. She underwent left carpal tunnel release on January 28, 2002. . . .

In the section entitled "Findings of Fact," the Commissioner found: "On August 11, 1999, claimant was first diagnosed with carpal tunnel syndrome by Dr. Oehme and was given anti-inflammatories." The Commissioner noted that Bass testified her initial injury occurred in January 2001. Under "Conclusions of Law," the Commissioner explained: "Carpal tunnel syndrome, even if caused by repetitive motion, is compensable as an accident under the Act." The Commissioner concluded:

Claimant suffered an injury by accident in January 2001 but did not report it until December 6, 2001. In the meantime, her condition became progressively worse such that ultimately it required a carpal tunnel release to both wrists. Although claimant had frequent conversations with her supervisor, she did not report her injury until eleven months thereafter which is unreasonable. The employer was prejudiced because it had no opportunity to provide medical treatment until claimant's condition had progressed to such an extent that surgery was required on both hands. Claimant is in violation of Section 42–15–20. Her claim is barred by her failure to give the requisite 90 days notice and her claim for benefits is denied.

The Appellate Panel unanimously affirmed the Single Commissioner and denied benefits to Bass. The Panel expounded:

The Findings of Fact and Conclusions of Law as established by the hearing commissioner are **correct** and ... are **adopted verbatim** by the panel as though repeated herein.

Further, to support the hearing commissioner's decision, this panel notes:

The commissioner found in his order that the claimant did indeed suffer an injury by accident. It was not compensable due to the claimant's failure to report and give notice as required by law.

## ORDER

The order of the single commissioner is hereby **affirmed.** All Findings of Fact and Conclusions of Law are incorporated to become the final Decision and Order of the South Carolina Workers' Compensation Commission.

(emphasis in original). In a footnote, the Panel stated that "[a]ll *unchanged* Findings of Fact and Conclusions of Law as contained in the single commissioner's order are specifically referenced and included *in toto* in the "order" portion of this decision." (Emphasis in original).

The circuit court reversed the Appellate Panel's decision regarding compensability on the ground that substantial evidence did not support the Appellate Panel's findings. The court ruled:

In her Form 50, Ms. Bass did place a single date of accident in January of 200[1]. She also, however, alleged that the repetitive loading and unloading of drums was the cause of her problems which resulted in the medical care and treatment of November 28, 2001. The Full Commission and the hearing commissioner ignored that alternative pleading. . . .

. . . To deny [Bass] benefits based on one position in her Form 50 denies the whole purpose of the South Carolina Workers' Compensation Act which is to protect injured workers.

The opinion of this Court, therefore, is that the Full Commission and the hearing commissioner's Order is not supported by substantial evidence of record and should be reversed. The medical records, particularly the testimony of Dr. Seastrunk coupled with Ms. Bass' testimony, clearly indicates that this was a repetitive motion injury deemed by our Supreme Court to be compensable. The purpose of the South Carolina Workers' Compensation Act is for inclusion

of injured workers not exclusion. Ms. Bass was injured in the course and scope of her employment and is entitled to benefits.

## STANDARD OF REVIEW

The South Carolina Administrative Procedures Act (APA) establishes the standard for judicial review of decisions of the Workers' Compensation Commission. *Lark v. Bi–Lo, Inc.*, 276 S.C. 130, 276 S.E.2d 304 (1981); *Hargrove v. Titan Textile Co.*, 360 S.C. 276, 599 S.E.2d 604 (Ct.App.2004). A reviewing court may reverse or modify a decision of an agency if the findings, inferences, conclusions, or decisions of that agency are "clearly erroneous in view of the reliable, probative and substantial evidence on the whole record." *Bursey v. South Carolina Dep't of Health & Envtl. Control*, 360 S.C. 135, 141, 600 S.E.2d 80, 84 (Ct.App.2004); S.C.Code Ann. § 1–23–380(A)(6)(e) (2005). Under the scope of review established in the APA, this Court may not substitute its judgment for that of the Appellate Panel as to the weight of the evidence on questions of fact, but may reverse where the decision is affected by an error of law. *Liberty Mut. Ins. Co. v. South Carolina Second Injury Fund*, 363 S.C. 612, 611 S.E.2d 297 (Ct.App.2005); *Frame v. Resort Servs., Inc.*, 357 S.C. 520, 593 S.E.2d 491 (Ct.App.2004); *Stephen v. Avins Constr. Co.*, 324 S.C. 334, 478 S.E.2d 74 (Ct.App.1996); S.C.Code Ann. § 1–23–380(A)(6)(d) (2005).

The substantial evidence rule of the APA governs the standard of review in a Workers' Compensation decision. *Frame*, 357 S.C. at 527, 593 S.E.2d at 494; *Corbin v. Kohler Co.*, 351 S.C. 613, 571 S.E.2d 92 (Ct.App.2002); *see also Lockridge v. Santens of America, Inc.*, 344 S.C. 511, 515, 544 S.E.2d 842, 844 (Ct.App.2001) ("Any review of the commission's factual findings is governed by the substantial evidence standard."). Pursuant to the APA, this Court's review is limited to deciding whether the Appellate Panel's decision is unsupported by substantial evidence or is controlled by some error of law. *See Rodriguez v. Romero*, 363 S.C. 80, 610 S.E.2d 488 (2005); *Gibson v. Spartanburg Sch. Dist. # 3*, 338 S.C. 510, 526 S.E.2d 725 (Ct.App.2000); S.C.Code Ann. § 1–23–380(A)(6) (2005); *see also Grant v. Grant Textiles*, 361 S.C.

188, 191, 603 S.E.2d 858, 859 (Ct.App.2004) ("A reviewing court will not overturn a decision by the Workers' Compensation Commission unless the determination is unsupported by substantial evidence or is affected by an error of law."); *Lyles v. Quantum Chem. Co. (Emery)*, 315 S.C. 440, 434 S.E.2d 292 (Ct.App.1993) (noting that in reviewing decision of Workers' Compensation Commission, court of appeals will not set aside its findings unless they are not supported by substantial evidence or they are controlled by error of law). Substantial evidence is not a mere scintilla of evidence, nor the evidence viewed blindly from one side of the case, but is evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion the administrative agency reached in order to justify its action. *Pratt v. Morris Roofing, Inc.*, 357 S.C. 619, 594 S.E.2d 272 (2004); *Jones v. Georgia–Pacific Corp.*, 355 S.C. 413, 586 S.E.2d 111 (2003); *Etheredge v. Monsanto Co.*, 349 S.C. 451, 562 S.E.2d 679 (Ct.App.2002); *Broughton v. South of the Border*, 336 S.C. 488, 520 S.E.2d 634 (Ct.App.1999).

 The Appellate Panel is the ultimate fact finder in Workers' Compensation cases and is not bound by the Single Commissioner's findings of fact. *Gibson*, 338 S.C. at 517, 526 S.E.2d at 729; *Muir v. C.R. Bard, Inc.*, 336 S.C. 266, 519 S.E.2d 583 (Ct.App.1999). The final determination of witness credibility and the weight to be accorded evidence is reserved to the Appellate Panel. *Shealy v. Aiken County*, 341 S.C. 448, 535 S.E.2d 438 (2000); *Parsons v. Georgetown Steel*, 318 S.C. 63, 456 S.E.2d 366 (1995); *Frame*, 357 S.C. at 528, 593 S.E.2d at 495; *Gibson*, 338 S.C. at 517, 526 S.E.2d at 729. The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. *Sharpe v. Case Produce, Inc.*, 336 S.C. 154, 519 S.E.2d 102 (1999); *DuRant v. South Carolina Dep't of Health & Envtl. Control*, 361 S.C. 416, 604 S.E.2d 704 (Ct.App.2004); *Corbin*, 351 S.C. at 618, 571 S.E.2d at 95; *Muir*, 336 S.C. at 282, 519 S.E.2d at 591. Where there are conflicts in the evidence over a factual issue, the findings of the Appellate Panel are conclusive. *Hargrove*, 360 S.C. at 290, 599 S.E.2d at 611; *Etheredge*, 349 S.C. at 455, 562 S.E.2d at 681.

▬▬▬▬ The findings of an administrative agency are presumed correct and will be set aside only if unsupported by substantial evidence. *Anderson v. Baptist Med. Ctr.,* 343 S.C. 487, 541 S.E.2d 526 (2001); *Hicks v. Piedmont Cold Storage, Inc.,* 335 S.C. 46, 515 S.E.2d 532 (1999); *Frame,* 357 S.C. at 528, 593 S.E.2d at 495. It is not within our province to reverse findings of the Appellate Panel which are supported by substantial evidence. *Pratt,* 357 S.C. at 622, 594 S.E.2d at 274–75; *Broughton,* 336 S.C. at 496, 520 S.E.2d at 637.

## LAW/ANALYSIS

Isochem argues the circuit court erred in reversing the Appellate Panel's denial of Workers' Compensation benefits to Bass. Isochem alleges Bass suffered a single, identifiable injury by accident in January of 2001 and failed to give notice of her injury within ninety days of its occurrence, as required by section 42–15–20 of the South Carolina Code. We disagree.

A priori, we are confronted with the novel issue arising from the factual scenario of this case: Is a repetitive trauma injury, i.e., carpal tunnel syndrome, treated separately and differently from an identifiable injury by accident under the notice mandate of section 42–15–20?

### I. Principles of Statutory Construction

▬▬▬▬ The cardinal rule of statutory interpretation is to determine the intent of the legislature. *Georgia–Carolina Bail Bonds, Inc. v. County of Aiken,* 354 S.C. 18, 579 S.E.2d 334 (Ct.App.2003); *see also Gordon v. Phillips Utils., Inc.,* 362 S.C. 403, 406, 608 S.E.2d 425, 427 (2005) ("The primary purpose in construing a statute is to ascertain legislative intent."). All rules of statutory construction are subservient to the one that legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in the light of the intended purpose of the statute. *McClanahan v. Richland County Council,* 350 S.C. 433, 567 S.E.2d 240 (2002); *Ray Bell Constr. Co. v. School Dist. of Greenville County,* 331 S.C. 19, 501 S.E.2d 725 (1998); *State v. Morgan,* 352 S.C. 359, 574 S.E.2d 203 (Ct.App.2002); *State v. Hudson,* 336 S.C. 237, 519 S.E.2d 577 (Ct.App.1999).

 The legislature's intent should be ascertained primarily from the plain language of the statute. *State v. Landis*, 362 S.C. 97, 606 S.E.2d 503 (Ct.App.2004); *Morgan*, 352 S.C. at 366, 574 S.E.2d at 206; *Stephen v. Avins Constr. Co.*, 324 S.C. 334, 478 S.E.2d 74 (Ct.App.1996). The language must also be read in a sense which harmonizes with its subject matter and accords with its general purpose. *Municipal Ass'n of South Carolina v. AT & T Communications of S. States, Inc.*, 361 S.C. 576, 606 S.E.2d 468 (2004); *Hitachi Data Sys. Corp. v. Leatherman*, 309 S.C. 174, 420 S.E.2d 843 (1992); *Morgan*, 352 S.C. at 366, 574 S.E.2d at 206; *Hudson*, 336 S.C. at 246, 519 S.E.2d at 582. The court's primary function in interpreting a statute is to ascertain the intent of the General Assembly. *Smith v. South Carolina Ins. Co.*, 350 S.C. 82, 564 S.E.2d 358 (Ct.App.2002). "Once the legislature has made [a] choice, there is no room for the courts to impose a different judgment based upon their own notions of public policy." *South Carolina Farm Bureau Mut. Ins. Co. v. Mumford*, 299 S.C. 14, 19, 382 S.E.2d 11, 14 (Ct.App.1989).

 When a statute's terms are clear and unambiguous on their face, there is no room for statutory construction and a court must apply the statute according to its literal meaning. *Miller v. Aiken*, 364 S.C. 303, 613 S.E.2d 364 (2005); *Carolina Power & Light Co. v. City of Bennettsville*, 314 S.C. 137, 442 S.E.2d 177 (1994). If a statute's language is unambiguous and clear, there is no need to employ the rules of statutory construction and this Court has no right to look for or impose another meaning. *Tilley v. Pacesetter Corp.*, 355 S.C. 361, 585 S.E.2d 292 (2003); *Paschal v. State Election Comm'n*, 317 S.C. 434, 454 S.E.2d 890 (1995); *see also City of Camden v. Brassell*, 326 S.C. 556, 561, 486 S.E.2d 492, 495 (Ct.App.1997) ("Where the language of the statute is clear and explicit, the court cannot rewrite the statute and inject matters into it which are not in the legislature's language."). What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will. *Bayle v. South Carolina Dep't of Transp.*, 344 S.C. 115, 542 S.E.2d 736 (Ct.App.2001). The words of a statute must be given their plain and ordinary meaning without resorting to subtle or forced construction. *Durham v. United Cos. Fin. Corp.*, 331 S.C. 600, 503 S.E.2d 465 (1998); *Adkins v. Comcar Indus.*,

*Inc.,* 323 S.C. 409, 475 S.E.2d 762 (1996); *Worsley Cos. v. South Carolina Dep't of Health & Envtl. Control,* 351 S.C. 97, 567 S.E.2d 907 (Ct.App.2002); *see also Timmons v. South Carolina Tricentennial Comm'n,* 254 S.C. 378, 175 S.E.2d 805 (1970) (observing that where the language of the statute is clear and explicit, the court cannot rewrite the statute and inject matters into it that are not in the legislature's language). Under the plain meaning rule, it is not the court's place to change the meaning of a clear and unambiguous statute. *Hodges v. Rainey,* 341 S.C. 79, 533 S.E.2d 578 (2000); *Bayle,* 344 S.C. at 122, 542 S.E.2d at 739.

If the language of an act gives rise to doubt or uncertainty as to legislative intent, the construing court may search for that intent beyond the borders of the act itself. *Morgan,* 352 S.C. at 367, 574 S.E.2d at 207; *see also Wade v. Berkeley County,* 348 S.C. 224, 229, 559 S.E.2d 586, 588 (2002) ("[W]here a statute is ambiguous, the Court must construe the terms of the statute."). An ambiguity in a statute should be resolved in favor of a just, beneficial, and equitable operation of the law. *Hudson,* 336 S.C. at 247, 519 S.E.2d at 582; *Brassell,* 326 S.C. at 561, 486 S.E.2d at 495; *City of Sumter Police Dep't v. One (1) 1992 Blue Mazda Truck,* 330 S.C. 371, 498 S.E.2d 894 (Ct.App.1998). In construing a statute, the court looks to the language as a whole in light of its manifest purpose. *State v. Dawkins,* 352 S.C. 162, 573 S.E.2d 783 (2002); *Adams v. Texfi Indus.,* 320 S.C. 213, 464 S.E.2d 109 (1995); *Brassell,* 326 S.C. at 560, 486 S.E.2d at 494.

A statute as a whole must receive a practical, reasonable, and fair interpretation consonant with the purpose, design, and policy of the lawmakers. *See Liberty Mut. Ins. Co. v. South Carolina Second Injury Fund,* 363 S.C. 612, 611 S.E.2d 297 (Ct.App.2005); *see also Georgia–Carolina Bail Bonds,* 354 S.C. at 22, 579 S.E.2d at 336 ("A statute should be given a reasonable and practical construction consistent with the purpose and policy expressed in the statute."). The real purpose and intent of the lawmakers will prevail over the literal import of the words. *Browning v. Hartvigsen,* 307 S.C. 122, 414 S.E.2d 115 (1992).

Courts will reject a statutory interpretation which would lead to a result so plainly absurd that it could not have

been intended by the legislature or would defeat the plain legislative intention. *Unisun Ins. Co. v. Schmidt,* 339 S.C. 362, 529 S.E.2d 280 (2000); *Kiriakides v. United Artists Communications, Inc.,* 312 S.C. 271, 440 S.E.2d 364 (1994). A court should not consider a particular clause in a statute as being construed in isolation, but should read it in conjunction with the purpose of the whole statute and the policy of the law. *See Liberty Mut. Ins. Co.,* 363 S.C. at 622, 611 S.E.2d at 302; *see also Mid-State Auto Auction v. Altman,* 324 S.C. 65, 476 S.E.2d 690 (1996) (stating that in ascertaining the intent of the legislature, a court should not focus on any single section or provision but should consider the language of the statute as a whole).

## II. Notice Requirement/Section 42-15-20

The notice requirement, section 42-15-20 of the South Carolina Workers' Compensation Act, reads:

> Every injured employee or his representative shall immediately on the occurrence of an accident, or as soon thereafter as practicable, give or cause to be given to the employer a notice of the accident and the employee shall not be entitled to physician's fees nor to any compensation which may have accrued under the terms of this Title prior to the giving of such notice, unless it can be shown that the employer, his agent or representative, had knowledge of the accident or that the party required to give such notice had been prevented from doing so by reason of physical or mental incapacity or the fraud or deceit of some third person. *No compensation shall be payable unless such notice is given within ninety days after the occurrence of the accident or death, unless reasonable excuse is made to the satisfaction of the Commission for not giving such notice and the Commission is satisfied that the employer has not been prejudiced thereby.*

S.C.Code Ann. § 42-15-20 (1985) (emphasis added).

Section 42-15-20 requires that every injured employee or his representative give the employer notice of a job-related accident within ninety days after its occurrence. *Hanks v. Blair Mills, Inc.,* 286 S.C. 378, 335 S.E.2d 91 (Ct.App.1985); *see also McCraw v. Mary Black Hosp.,* 350

S.C. 229, 237, 565 S.E.2d 286, 290 (2002) ("Pursuant to S.C.Code Ann. § 42–15–20 (1985), notice to the employer must be given within 90 days after the occurrence of the accident upon which the employee is basing her claim."). Generally, the injury is not compensable unless notice is given within ninety days. *Muir v. C.R. Bard, Inc.*, 336 S.C. 266, 519 S.E.2d 583 (Ct.App.1999). The burden is upon the claimant to show compliance with the notice provisions of section 42–15–20. *See Lowe v. Am–Can Transport Servs., Inc.*, 283 S.C. 534, 324 S.E.2d 87 (Ct.App.1984).

Section 42–15–20 provides no specific method of giving notice, the object being that the employer be actually put on notice of the injury so he can investigate it immediately after its occurrence and can furnish medical care for the employee in order to minimize the disability and his own liability. *See Teigue v. Appleton Co.*, 221 S.C. 52, 68 S.E.2d 878 (1952); *Hanks*, 286 S.C. at 381, 335 S.E.2d at 93. While the notice requirement must be construed liberally in favor of claimants, it is "not to be treated as a mere formality or technicality and dispensed with as a matter of course." *Mintz v. Fiske–Carter Constr. Co.*, 218 S.C. 409, 414, 63 S.E.2d 50, 52 (1951). The purpose of section 42–15–20 is twofold: "first, it affords protection of the employer in order that he may investigate the facts and question witnesses while their memories are unfaded, and second, it affords the employer opportunity to furnish medical care of the employee in order to minimize the disability and consequent liability upon the employer." *Id.*

This Court addressed the notice requirement in *Etheredge v. Monsanto Co.*, 349 S.C. 451, 562 S.E.2d 679 (Ct.App.2002):

The statutory efficacy of § 42–15–20 is bifurcated: (1) affording protection for the employer to investigate the facts and circumstances of an accident or injury and to question witnesses while memories are fresh; and (2) permitting the employer the opportunity and privilege to provide medical treatment and care to minimize disability and concomitant liability of the employer.

We rule the language of § 42–15–20 in regard to notice should be liberally construed in favor of claimants. We conclude that notice is adequate, when there is some knowl-

edge of accompanying facts connecting the injury or illness with the employment, and signifying to a reasonably conscientious supervisor that the case might involve a potential compensation claim.

*Id.* at 459, 562 S.E.2d at 683.

In his treatise on Workers' Compensation law, Professor Larson discussed the notice requirement:

> Under most acts, there are two distinct limitations periods that must be observed: The period for notice of injury, and the period for claiming compensation.
>
> Notice of injury, the first step in compensation procedure, is normally given to the employer.... The period is comparatively short; it may be "forthwith," or "as soon as practicable," or a specified period of a few weeks or months. The purpose is dual: First, to enable the employer to provide immediate medical diagnosis and treatment with a view to minimizing the seriousness of the injury; and second, to facilitate the earliest possible investigation of the facts surrounding the injury. If, upon receiving notice, the employer wishes to controvert the claim, it must itself file a notice to this effect. Failure to do so, however, will not estop the employer from later asserting its defenses.

7 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 126.01 (2004).

Section 42–15–20 is a policy statement embedded in the Workers' Compensation Act by the South Carolina General Assembly that consolidates and harmonizes the employer and employee under the statutory rubric of notification and accountability.

### III. Repetitive Trauma Injury

■ Generally, a repetitive trauma injury, such as carpal tunnel syndrome, is compensable under the Workers' Compensation Act. *Pee v. AVM, Inc.,* 352 S.C. 167, 573 S.E.2d 785 (2002). The *Pee* court found "a repetitive trauma injury meets the definition of injury by accident in that it is an unforeseen injury caused by trauma." *Id.* at 174, 573 S.E.2d 785, 573 S.E.2d at 789.

██ Repetitive trauma injuries have a gradual onset caused by the cumulative effect of repetitive traumatic events or "mini-accidents." *Schurlknight v. City of North Charleston,* 352 S.C. 175, 574 S.E.2d 194 (2002). It is difficult to determine the date an accident occurs in a repetitive trauma case because there is no definite time of injury. *Id.* "Applying the discovery rule to such an injury often works to the prejudice of an employee who discovers symptoms of a repetitive trauma injury but continues to work." *Id.* at 178, 574 S.E.2d at 195.

██ In a repetitive trauma case, although the statute of limitations begins to run the last day of exposure, a Workers' Compensation claimant is still required to separately give the employer notice of an injury. *See Schurlknight,* 352 S.C. at 178–79, 574 S.E.2d at 195–96 (citing § 42–15–20) ("We also note the separate requirement that a worker give the employer notice of an injury."). This notice requirement ensures the employer will not be unfairly prejudiced by a two-year period for filing that begins from the last date of exposure. *Id.*

IV. Applicability of Section 42–15–20 to Repetitive Trauma Injury/Carpal Tunnel Syndrome

A. The Extant Evidentiary Record

Deciding this case on the basis of a specific "accident" in January of 2001 is a misreckoning or inadvertency of the factual and legal record. Encapsulated in the Single Commissioner's order, as affirmed by the Appellate Panel, is specific and definitive discussion and evaluation of the carpal tunnel syndrome experienced by Bass with precedential analysis beginning with *Pee.* A failure by this Court to decide the novel issue of whether carpal tunnel syndrome as a repetitive trauma injury meets the statutory mandate of section 42–15–20 at the temporal occurrence of the disabling injury would be judicial dereliction.

B. Analogy to Occupational Disease Cases

██ Section 42–15–20 applies in occupational disease cases. In *Hanks v. Blair Mills, Inc.,* 286 S.C. 378, 335 S.E.2d 91 (Ct.App.1985), the court of appeals explicated:

The appellants argue that Hanks failed to comply with the statutory requirement that he give notice of his injury to

his employer within ninety days after its occurrence. They point out that if the injury occurred on June 28, 1979, the date Hanks was diagnosed as permanently and totally disabled, Hanks did not give them notice of his injury until December 3, 1980, the date he filed the claim.

. . . .

Section 42–15–20 requires that every injured employee or his representative give the employer notice of a job-related accident within ninety days after its occurrence. Generally, the injury is not compensable if timely notice is not given. **In the case of occupational diseases, the "accident" occurs when the employee becomes disabled and could, through reasonable diligence, discover that his condition is a compensable one.** *Drake v. Raybestos–Manhattan, Inc.*, 241 S.C. 116, 127 S.E.2d 288 (1962).

Section 42–15–20 provides no specific method of giving notice, the object being that the employer be actually put on notice of the injury so he can investigate it immediately after its occurrence and can furnish medical care for the employee in order to minimize the disability and his own liability. *Teigue v. Appleton Co.*, 221 S.C. 52, 68 S.E.2d 878 (1952).

*Id.* at 381, 335 S.E.2d at 93 (emphasis added). Thereafter, in *Bailey v. Covil Corp.*, 291 S.C. 417, 354 S.E.2d 35 (1987), the supreme court held:

Employers also contend that Employee did not give timely notice of his claim. **An employee must give notice of an occupational disease claim within ninety days after the date he becomes disabled and could discover with reasonable diligence that his condition is compensable.** [*White v. Orr–Lyons Mills*, 287 S.C. 174, 336 S.E.2d 467 (1985); *Drake v. Raybestos–Manhattan, Inc.*, 241 S.C. 116, 127 S.E.2d 288 (1962); *Hanks v. Blair Mills, Inc.*, 286 S.C. 378, 335 S.E.2d 91 (Ct.App.1985)]; S.C.Code Ann. § 42–15–20 (1985). **The filing of the claim in this case within ninety days of the date of disability satisfied the requirement of timely notice.**

*Id.* at 419, 354 S.E.2d at 36 (emphasis added).

In *Muir v. C.R. Bard, Inc.*, 336 S.C. 266, 519 S.E.2d 583 (Ct.App.1999), the court of appeals examined the notice re-

quirement as it applies to a claimant with an occupational disease:

> Bard avers the Circuit Court erred in refusing to reverse the Commission's decision that Muir gave timely notice of his claim pursuant to S.C.Code Ann. § 42–15–20 (1985).

> Section 42–15–20 requires an injured employee to "immediately on the occurrence of an accident, or as soon thereafter as practicable, give or cause to be given to the employer a notice of the accident." Generally, the injury is not compensable unless notice is given within ninety days. *Id.* With an occupational disease, the "accident" occurs when the employee becomes disabled and could, through reasonable diligence, discover that his condition is compensable. *Bailey v. Covil Corp.*, 291 S.C. 417, 354 S.E.2d 35 (1987); *Hanks v. Blair Mills, Inc.*, 286 S.C. 378, 335 S.E.2d 91 (Ct.App.1985). In occupational disease cases, compensability accrues at the time of death or disability. *See Glenn v. Columbia Silica Sand Co.*, 236 S.C. 13, 112 S.E.2d 711 (1960).

> Bard argues Muir did not give timely notice of injury because he was not reasonable in discovering the nature of his medical problems. It does not dispute Muir's testimony that he informed his superiors at Bard in the spring of 1992 of his diagnosis and belief that he had contracted the hepatitis through handling the catheters.

> **Notice begins to run when the employee becomes disabled and could discover with reasonable diligence his condition is compensable.** Muir did not become disabled by his condition until August, 1992. Therefore, Muir had actually given notice of the nature of his disease before he became disabled.

*Id.* at 295, 519 S.E.2d at 598 (emphasis added).

Professor Larson declared: "The optimum rule in disease cases ... is the dual type of rule worked out judicially in California: The period begins to run when the disease has culminated in disability and when by reasonable diligence the claimant could have discovered that the condition was a compensable one." 7 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 126.10[2] (2004).

## C. Other Jurisdictions

■■■ Our research leads to the ineluctable conclusion that the efficacy of section 42–15–20 has never been analyzed in regard to a repetitive trauma injury, i.e., carpal tunnel syndrome. No South Carolina case has addressed this precise question. We commence our unprecedented and neoteric juridical journey in facing this novel issue by visiting other jurisdictions for edification and enlightenment. When there is no case on point in South Carolina, our courts may look to other states to determine if the issue has been decided and if the decision is persuasive authority. *See Williams v. Morris,* 320 S.C. 196, 464 S.E.2d 97 (1995); *Silva v. Silva,* 333 S.C. 387, 509 S.E.2d 483 (Ct.App.1998); *Golini v. Bolton,* 326 S.C. 333, 482 S.E.2d 784 (Ct.App.1997).

The Supreme Court of Tennessee, in *Lawson v. Lear Seating Corp.,* 944 S.W.2d 340 (Tenn.1997), ruled that, in gradual onset injuries like carpal tunnel syndrome, the date of the accident is the date on which the injury prevents the employee from working. *Id.* at 343; *see also Central Motor Express, Inc. v. Burney,* 214 Tenn. 118, 377 S.W.2d 947 (1964) (noting that the beginning date for computing notice to the employer in a gradual injury case is the date on which the disability manifests itself to such an extent that employee was forced to leave work).

When faced with this issue, the Court of Appeals of Kentucky concluded that "in cases where the injury is the result of many mini-traumas, the date for giving notice and the date for clocking a statute of limitations begins when the disabling reality of the injuries becomes manifest." *Randall Co. v. Pendland,* 770 S.W.2d 687, 688 (Ky.Ct.App.1988). The Supreme Court of Kentucky announced:

[T]he notice and limitations provisions for a gradual injury are triggered when the worker becomes aware of a gradual injury and knows that it was caused by work, regardless of whether the symptoms that led to discovery of the injury later subside. This approach is consistent with one of the purposes of the notice requirement, to enable the employer to take measures to minimize the worker's ultimate impairment and, hence, its liability.

*Holbrook v. Lexmark Int'l Group, Inc.,* 65 S.W.3d 908, 911 (Ky.2001). Recently, the Supreme Court of Kentucky reiterated:

A gradual injury generally arises imperceptibly, from the physical strain of numerous instances of minor workplace trauma, also referred to as minitrauma. For that reason, the courts have applied a rule of discovery for establishing the date of injury. Hence, a gradual injury becomes manifest for the purpose of notice and limitations with the worker's knowledge of the harmful change and the fact that it is caused by the work.

*Brummitt v. Southeastern Kentucky Rehab. Indus.,* 156 S.W.3d 276 (Ky.2005).

In *International Paper Co. v. Melton,* 866 So.2d 1158 (Ala.Civ.App.2003), the trial court found: "Regarding the notice issue of [Melton's] carpal tunnel claim, the courts have held that the date of injury for cumulative trauma disorders such as carpal tunnel syndrome is the date of last exposure to the injurious job stimulation." Affirming the trial court, the Court of Civil Appeals of Alabama stated:

Moreover, in *Zeanah v. Stewart Animal Clinic, P.C.,* 752 So.2d 505, 508 (Ala.Civ.App.1999), this court relied upon *Dun & Bradstreet [Corp. v. Jones,* 678 So.2d 181 (Ala.Civ. App.1996),] in concluding that, for purposes of the notice requirements under § 25-5-78, "[f]or accidents or occurrences involving cumulative-stress disorders, the date of the worker's last exposure to the stressor is considered the date of the injury."

... Based on the facts of this case and our holding in *Zeanah, supra,* we conclude that the trial court did not err in finding that Melton gave International Paper adequate and proper notice of his carpal tunnel syndrome claim.

*Id.* at 1162–63.

The Supreme Court of Pennsylvania, in *City of Philadelphia v. Workers' Comp. Appeal Bd.,* 578 Pa. 207, 851 A.2d 838 (2004), explained:

[T]he question is a legal one concerning when the 120–day notice period in Section 311 begins to run in the case of an aggravation/ cumulative trauma injury, where the claimant suffers daily aggravation of her diagnosed condition, which

becomes disabling only on her last day of employment. This is a question of statutory construction....

....

... [I]n fixing the date of the occurrence of such an aggravation injury [carpel tunnel syndrome], it is apparent that the Commonwealth Court cases recognizing the distinct nature of such injuries are correct. Thus, where as here the credited medical evidence establishes that a cumulative trauma disorder was at issue, and that conditions at work cause [a daily] aggravation of the disorder, notice must be deemed timely so long as it was given within 120 days of the last aggravation injury—which will usually be the last day at work or the day where total disability resulted.

*Id.* at 843, 847–48.

The Court of Civil Appeals of Oklahoma inculcated: "[A] cumulative trauma injury is a single injury for purposes of notice and limitations. The date of last exposure applies." *Fabsco Shell & Tube v. Eubank,* 84 P.3d 792, 796 (Okla.Civ. App.2003) (citations omitted).

The Court of Appeals of Iowa, in *Venenga v. John Deere Component Works,* 498 N.W.2d 422 (Iowa Ct.App.1993), articulated:

Iowa adopted the cumulative injury rule in *McKeever Custom Cabinets v. Smith,* 379 N.W.2d 368, 374 (Iowa 1985). In *McKeever,* the court also addressed the question of when a cumulative injury occurs for reporting and time limitation purposes: when pain prevents the employee from continuing to work, or when the pain occasions the need for medical attention. *Id.* The court adopted the rule finding an employee is disabled and injured when, because of pain or physical inability, he or she can no longer work. *Id.*

*Id.* at 424.

The Supreme Court of Montana reviewed the notice requirement:

We conclude that claimant satisfied the notice requirement. Since claimant's disability was the result of cumulative traumas which occurred over a period of time, the date of injury, for purposes of complying with the notice require-

ment, is the date on which claimant was first unable to continue with his employment due to his physical condition. *Bodily v. John Jump Trucking, Inc.,* 250 Mont. 274, 819 P.2d 1262, 1267–68 (1991).

■ In contradistinction to a time-dated accident, this evidentiary record posits a magnitudinous presentation of a carpal tunnel syndrome accidental injury. Bass' testimony and the testimony of Dr. McQueen and Dr. Seastrunk support Bass' contention that her arms gradually worsened over time to the extent that she needed medical treatment and was disabled.

## CONCLUSION

■ We rule that in applying section 42–15–20 to a repetitive trauma injury, i.e., carpal tunnel syndrome, the Workers' Compensation Commission shall determine the statutory notice requirement from the time of disablement of the claimant. Notice begins to run when the employee becomes disabled and could discover with reasonable diligence his condition is compensable.

Analyzing the efficacy of section 42–15–20 in regard to the injury suffered and sustained by Bass, we agree with the circuit judge that Bass did not sustain a single, identifiable injury by accident in January of 2001. There is *NO* substantial evidence in the record to support a factual finding that Bass suffered and sustained a single, identifiable injury by accident in January of 2001. The only evidence in the record is that Bass suffered and sustained a repetitive trauma injury, carpal tunnel syndrome, over a period of time resulting in disability in November of 2001.

We remand to the South Carolina Workers' Compensation Commission to make findings of fact and conclusions of law consistent with the adoption of our holding concerning the efficacy of section 42–15–20 in a repetitive trauma injury scenario.

Based on the foregoing, we **AFFIRM IN RESULT and REMAND.**

STILWELL and WILLIAMS, JJ., concur.