666 S.E.2d 272

**The STATE of South Carolina, Respondent,**

v.

**Ricky BRANNON, Appellant.**

**No. 4428.**

Court of Appeals of South Carolina.

Submitted June 1, 2008.

Decided July 18, 2008.

Rehearing Denied Sept. 3, 2008.

Deputy Chief Appellate Defender for Capital Appeals Robert M. Dudek, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Assistant Attorney General Michelle Parsons, all of Columbia; and Solicitor Harold W. Gowdy, III, of Spartanburg, for Respondent.

ANDERSON, J.:

Appellant Ricky Brannon was convicted of resisting arrest for fleeing on foot from police officers who yelled, "Stop, police." Citing a lack of direct and substantial circumstantial

evidence, he argues the circuit court judge erred in denying his motion for a directed verdict. We agree.[1]

## FACTUAL/PROCEDURAL BACKGROUND

Maria Raney, a resident of Westwood Apartments in Gaffney, awoke in the early morning hours of April 21, 2003. Upon looking out her window, she observed her car with its interior light illuminated and a man moving around inside. She called 911 and the operator asked her to stay on the line until police arrived. Raney complied and informed the operator when she saw Gaffney Police Department Officers Michael Scruggs and Randy Quinn. Raney testified the officers "came up and they hollered police and I saw them as [they] chased him."

With dispatch relaying information as it was supplied by Raney, Officer Scruggs and Officer Quinn approached the apartment building with the headlights and sirens off. Once in proximity, the officers proceeded on foot and observed a figure standing outside a vehicle whose interior light was on. Raney's observations, as conveyed by dispatch, informed them the suspect had moved on to another car, a Ford Explorer owned by a neighbor's mother. The officers saw only one figure in the parking lot by an Explorer. Scruggs explained "[a]t that time, we knew we had a crime being committed." Scruggs said the person looked up, apparently hearing them. Scruggs testified:

Q: Now, when y'all came up, you say you identified yourself. Tell me exactly what you said.

A: I think Officer Quinn told him just, said just stop police, or I believe that's what he said.

Q: Okay. Stop police. Was anything else said to him?

A: No, sir, other than stop again because he was already running.

Q: All right. So all that was said to him was stop police and then stop again? He was never placed under arrest?

A: No, sir, not until we caught him.

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

Officer Quinn testified:

Q: Based upon information you had, did you believe the subject, at that time, was the individual breaking into motor vehicles?

A: Yes, sir.

Q: And what was your intention when the subject took off?

. . .

A: Our intention was to approach the subject and find out exactly what he was doing there at that time. We believe he was breaking into a motor vehicle and we placed him under arrest for that charge.

Brannon ran three hundred to three hundred fifty yards before being placed under arrest. The record does not indicate Brannon resisted the officers once caught. Scruggs explained:

Q: Why was he charged with resisting arrest?

A: For running on myself and Officer Quinn.

After being found guilty, Brannon was sentenced to three years in prison for breaking into a motor vehicle, suspended upon the service of two years, and one year probation. He was additionally sentenced to one year in prison for resisting arrest. The sentences are concurrent.

## STANDARD OF REVIEW

In criminal cases, an appellate court sits to review errors of law only. *State v. Baccus,* 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006); *State v. Miller,* 375 S.C. 370, 378, 652 S.E.2d 444, 448 (Ct.App.2007); *State v. Wood,* 362 S.C. 520, 525, 608 S.E.2d 435, 438 (Ct.App.2004). Thus, an appellate court is bound by the trial court's factual findings unless they are clearly erroneous. *Id.; State v. Landis,* 362 S.C. 97, 101, 606 S.E.2d 503, 504 (Ct.App.2004). On appeal, we are limited to determining whether the trial court abused its discretion. *State v. Reed,* 332 S.C. 35, 43, 503 S.E.2d 747, 751 (1998); *State v. Walker,* 366 S.C. 643, 653, 623 S.E.2d 122, 127 (Ct.App.2005). The conduct of a criminal trial is left largely to the sound discretion of the trial judge, who will not be reversed absent a prejudicial abuse of discretion. *State v. Bridges,* 278 S.C. 447, 448, 298 S.E.2d 212, 212 (1982); *State v. Patterson,* 367 S.C.

219, 230, 625 S.E.2d 239, 245 (Ct.App.2006), *cert. denied,* May 3, 2007.

## *LAW / ANALYSIS*

### I. Directed Verdict

Brannon contends the trial court erred in denying his motion for directed verdict on the resisting arrest charge.

When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight. *State v. Weston,* 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006); *State v. Stanley,* 365 S.C. 24, 41–42, 615 S.E.2d 455, 464 (Ct.App.2005); *State v. Padgett,* 354 S.C. 268, 271, 580 S.E.2d 159, 161 (Ct.App.2003). A defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged. *State v. Cherry,* 361 S.C. 588, 593, 606 S.E.2d 475, 478 (2004) (citing *State v. McKnight,* 352 S.C. 635, 642, 576 S.E.2d 168, 171 (2003)); *State v. Crawford,* 362 S.C. 627, 633, 608 S.E.2d 886, 889 (Ct.App. 2005); *Padgett,* 354 S.C. at 271, 580 S.E.2d at 161. When reviewing a denial of a directed verdict, an appellate court views evidence and all reasonable inferences in the light most favorable to the State. *Weston,* 367 S.C. at 292, 625 S.E.2d at 648; *State v. Zeigler,* 364 S.C. 94, 101, 610 S.E.2d 859, 863 (Ct.App.2005); *State v. Al–Amin,* 353 S.C. 405, 411, 578 S.E.2d 32, 35 (Ct.App.2003). If there is any direct evidence or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find the case was properly submitted to the jury. *Weston,* 367 S.C. at 292–93, 625 S.E.2d at 648; *Cherry,* 361 S.C. at 593, 606 S.E.2d at 478; *McKnight,* 352 S.C. at 642, 576 S.E.2d at 172; *State v. Condrey,* 349 S.C. 184, 190, 562 S.E.2d 320, 323 (Ct.App.2002); *see also State v. Horton,* 359 S.C. 555, 563, 598 S.E.2d 279, 284 (Ct.App.2004) (noting judge should deny motion for directed verdict if there is any direct or substantial circumstantial evidence that reasonably tends to prove the defendant's guilt, or from which guilt may be fairly and logically deduced). The appellate court may reverse the trial court's denial of a motion for a directed verdict only if there is no evidence to support the court's ruling. *State v. Gaster,* 349 S.C. 545, 564 S.E.2d 87 (2002).

■ The trial court should grant a directed verdict when the evidence merely raises a suspicion that the defendant is guilty. *State v. Arnold,* 361 S.C. 386, 390, 605 S.E.2d 529, 531 (2004); *State v. Schrock,* 283 S.C. 129, 132, 322 S.E.2d 450, 452 (1984); *State v. Horne,* 324 S.C. 372, 379, 478 S.E.2d 289, 293 (Ct.App.1996). " 'Suspicion' implies a belief or opinion as to guilt based upon facts or circumstances which do not amount to proof." *Cherry,* 361 S.C. at 594, 606 S.E.2d at 478. However, a trial court is not required to find that the evidence infers guilt to the exclusion of any other reasonable hypothesis. *Id.*

## II. Rules of Statutory Construction

■ The cardinal rule of statutory interpretation is to determine the intent of the legislature. *Bass v. Isochem,* 365 S.C. 454, 459, 617 S.E.2d 369, 377 (Ct.App.2005); *Georgia–Carolina Bail Bonds, Inc. v. County of Aiken,* 354 S.C. 18, 22, 579 S.E.2d 334, 336 (Ct.App.2003); *Smith v. S.C. Ins. Co.,* 350 S.C. 82, 87, 564 S.E.2d 358, 361 (Ct.App.2002); *see also Gordon v. Phillips Utils., Inc.,* 362 S.C. 403, 406, 608 S.E.2d 425, 427 (2005) ("The primary purpose in construing a statute is to ascertain legislative intent."). All rules of statutory construction are subservient to the one that legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in the light of the intended purpose of the statute. *McClanahan v. Richland County Council,* 350 S.C. 433, 438, 567 S.E.2d 240, 242 (2002); *Ray Bell Constr. Co. v. Sch. Dist. of Greenville County,* 331 S.C. 19, 26, 501 S.E.2d 725, 729 (1998); *State v. Morgan,* 352 S.C. 359, 365–66, 574 S.E.2d 203, 206 (Ct.App.2002); *State v. Hudson,* 336 S.C. 237, 246, 519 S.E.2d 577, 581 (Ct.App.1999). "Once the legislature has made [a] choice, there is no room for the courts to impose a different judgment based upon their own notions of public policy." *S.C. Farm Bureau Mut. Ins. Co. v. Mumford,* 299 S.C. 14, 19, 382 S.E.2d 11, 14 (Ct.App. 1989).

■ The legislature's intent should be ascertained primarily from the plain language of the statute. *State v. Landis,* 362 S.C. 97, 102, 606 S.E.2d 503, 505 (Ct.App.2004); *Morgan,* 352 S.C. at 366, 574 S.E.2d at 206; *Stephen v. Avins Constr. Co.,* 324 S.C. 334, 339, 478 S.E.2d 74, 77 (Ct.App.1996). The

language must be read to harmonize with its subject matter and accord with its general purpose. *Mun. Ass'n of S.C. v. AT&T Commc'ns of S. States, Inc.,* 361 S.C. 576, 580, 606 S.E.2d 468, 470 (2004); *Hitachi Data Sys. Corp. v. Leatherman,* 309 S.C. 174, 178, 420 S.E.2d 843, 846 (1992); *Morgan,* 352 S.C. at 366, 574 S.E.2d at 206; *Hudson,* 336 S.C. at 246, 519 S.E.2d at 582.

When a statute's terms are clear and unambiguous on their face, there is no room for statutory construction and a court must apply the statute according to its literal meaning. *Miller v. Aiken,* 364 S.C. 303, 307, 613 S.E.2d 364, 366 (2005); *Carolina Power & Light Co. v. City of Bennettsville,* 314 S.C. 137, 139, 442 S.E.2d 177, 179 (1994); *Jones v. State Farm Mut. Auto. Ins. Co.,* 364 S.C. 222, 231, 612 S.E.2d 719, 723 (Ct.App.2005). If a statute's language is unambiguous and clear, there is no need to employ the rules of statutory construction and this Court has no right to look for or impose another meaning. *Tilley v. Pacesetter Corp.,* 355 S.C. 361, 373, 585 S.E.2d 292, 298 (2003); *Paschal v. State Election Comm'n,* 317 S.C. 434, 436, 454 S.E.2d 890, 892 (1995). What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will. *Bayle v. S.C. Dep't of Transp.,* 344 S.C. 115, 122, 542 S.E.2d 736, 740 (Ct.App.2001). The words of a statute must be given their plain and ordinary meaning without resorting to subtle or forced construction. *Durham v. United Cos. Fin. Corp.,* 331 S.C. 600, 604, 503 S.E.2d 465, 468 (1998); *Adkins v. Comcar Indus., Inc.,* 323 S.C. 409, 411, 475 S.E.2d 762, 763 (1996); *Worsley Cos. v. S.C. Dep't of Health & Envtl. Control,* 351 S.C. 97, 102, 567 S.E.2d 907, 910 (Ct.App.2002); *see also Timmons v. S.C. Tricentennial Comm'n,* 254 S.C. 378, 402, 175 S.E.2d 805, 817 (1970) (observing that where the language of the statute is clear and explicit, the court cannot rewrite the statute and inject matters into it that are not in the legislature's language). Under the plain meaning rule, it is not the court's place to change the meaning of a clear and unambiguous statute. *Vaughn v. Bernhardt,* 345 S.C. 196, 198, 547 S.E.2d 869, 870 (2001); *Hodges v. Rainey,* 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000); *Bayle,* 344 S.C. at 122, 542 S.E.2d at 739; *see also Shealy v. Doe,* 370 S.C. 194, 199–200, 634 S.E.2d 45, 48 (Ct.App.2006), *cert. denied,* Aug. 9, 2007.

In construing a statute, the court looks to the language as a whole in light of its manifest purpose. *State v. Dawkins*, 352 S.C. 162, 166, 573 S.E.2d 783, 785 (2002); *Adams v. Texfi Indus.*, 320 S.C. 213, 217, 464 S.E.2d 109, 112 (1995); *Brassell*, 326 S.C. at 560, 486 S.E.2d at 494. A statute as a whole must receive a practical, reasonable, and fair interpretation consonant with the purpose, design, and policy of the lawmakers. *See Liberty Mut. Ins. Co. v. S.C. Second Injury Fund*, 363 S.C. 612, 621, 611 S.E.2d 297, 301 (Ct.App. 2005); *see also Georgia–Carolina Bail Bonds*, 354 S.C. at 22, 579 S.E.2d at 336 ("A statute should be given a reasonable and practical construction consistent with the purpose and policy expressed in the statute."). The real purpose and intent of the lawmakers will prevail over the literal import of the words. *Browning v. Hartvigsen*, 307 S.C. 122, 125, 414 S.E.2d 115, 117 (1992).

Courts will reject a statutory interpretation which would lead to a result so plainly absurd that it could not have been intended by the legislature or would defeat the plain legislative intention. *Unisun Ins. Co. v. Schmidt*, 339 S.C. 362, 368, 529 S.E.2d 280, 283 (2000); *Kiriakides v. United Artists Commc'ns, Inc.*, 312 S.C. 271, 275, 440 S.E.2d 364, 366 (1994). A court should not consider a particular clause in a statute as being construed in isolation, but should read it in conjunction with the purpose of the whole statute and the policy of the law. *See Liberty Mut. Ins. Co.*, 363 S.C. at 622, 611 S.E.2d at 302; *see also Mid–State Auto Auction v. Altman*, 324 S.C. 65, 69, 476 S.E.2d 690, 692 (1996) (stating that in ascertaining the intent of the legislature, a court should not focus on any single section or provision but should consider the language of the statute as a whole).

"Finally, when a statute is penal in nature, it must be construed strictly against the State and in favor of the defendant." *State v. Blackmon*, 304 S.C. 270, 273, 403 S.E.2d 660, 662 (1991) (citing *State v. Cutler* 274, S.C. 376, 274 S.C. 376, 264 S.E.2d 420 (1980)); *see also State v. Dingle*, 376 S.C. 643, 649–50, 659 S.E.2d 101, 105 (2008); *State v. Gordon*, 356 S.C. 143, 153, 588 S.E.2d 105, 110 (2003); *Kerr v. State*, 345 S.C. 183, 189, 547 S.E.2d 494, 497 (2001); *Hair v. State*, 305 S.C. 77, 79, 406 S.E.2d 332, 334 (1991); *State v. Graves*, 269 S.C.

356, 360, 237 S.E.2d 584, 586 (1977) (Because statute at issue is penal in nature "we must approach it's interpretation by invoking the rule of strict statutory construction and resolve any uncertainty or ambiguity against the State and in favor of the respondent."); *Lewis v. Gaddy,* 254 S.C. 66, 71, 173 S.E.2d 376, 378 (1970).

## III.  Stops and Arrests

The Fourth Amendment of the United States Constitution—applicable to the states through the Fourteenth Amendment—guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amends.  IV & XIV; *State v. Pichardo,* 367 S.C. 84, 97, 623 S.E.2d 840, 847 (Ct.App.2005); *see also Union Pac. Ry. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891) ("No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.").

A police officer may stop and briefly detain and question a person for investigative purposes, without treading upon his Fourth Amendment rights, when the officer has a reasonable suspicion supported by articulable facts, short of probable cause for arrest, that the person is involved in criminal activity.  *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Robinson,* 306 S.C. 399, 412 S.E.2d 411 (1991); *State v. Foster,* 269 S.C. 373, 237 S.E.2d 589 (1977); *State v. Woodruff,* 344 S.C. 537, 546, 544 S.E.2d 290, 295 (Ct.App.2001).  The term "reasonable suspicion" requires a particularized and objective basis that would lead one to suspect another of criminal activity.  *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *State v. Lesley,* 326 S.C. 641, 486 S.E.2d 276 (Ct.App.1997). In determining whether reasonable suspicion exists, the whole picture must be considered.  *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *State v. Blassingame,* 338 S.C. 240, 248, 525 S.E.2d 535, 539 (Ct.App.1999).

■■■ The test for determining if a particular encounter constitutes a seizure within the meaning of the Fourth Amendment is whether in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); *United States v. Analla,* 975 F.2d 119 (4th Cir.1992); *see also United States v. Sullivan,* 138 F.3d 126, 132 (4th Cir.1998) ("The test ... [is] whether, under the totality of the circumstances surrounding the encounter, a reasonable person in the suspect's position 'would have felt free to decline the officer's requests or otherwise terminate the encounter.' ") (citations omitted). So long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification. *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct taken as a whole. *Chesternut,* 486 U.S. at 573, 108 S.Ct. 1975; *State v. Williams,* 351 S.C. 591, 600, 571 S.E.2d 703, 708 (Ct.App.2002). Thus, exactly what constitutes a restraint on liberty sufficient to lead a reasonable person to conclude he is not free to leave varies with the setting in which the police conduct occurs. *Id.*

Reasonableness is measured in objective terms by examining the totality of the circumstances. *Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); *Williams,* 351 S.C. at 600, 571 S.E.2d at 708. As a result, the nature of the reasonableness inquiry is highly fact-specific. *Id.* Although no single factor dictates whether a seizure has occurred, courts have identified certain probative factors, including the time and place of the encounter, the existence and nature of any prior seizure, whether there was a clear and expressed endpoint to any such prior detention, the number of officers present and whether they were uniformed, the length of the detention, whether the officer moved the person to a different location or isolated him from others, whether the officer informed the person he was free to leave, whether the officer indicated to the person that he was suspected of a crime, and whether the officer retained the person's documents or exhib-

ited threatening behavior or physical contact. *Pichardo*, 367 S.C. at 101, 623 S.E.2d at 849. *See also United States v. Beck*, 140 F.3d 1129 (8th Cir.1998); *Ferris v. State*, 355 Md. 356, 735 A.2d 491 (1999).

"If the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances." *State v. Culbreath*, 300 S.C. 232, 236, 387 S.E.2d 255, 257 (1990), *abrogated on other grounds by Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). Even where the stop is deemed proper, "before the police may frisk a defendant, they must have a reasonable belief the defendant is armed and dangerous." *State v. Fowler*, 322 S.C. 263, 267, 471 S.E.2d 706, 708 (Ct.App.1996). In assessing whether a suspect is armed and dangerous, the officer need not be absolutely certain the individual is armed. *Terry*, 392 U.S. at 27, 88 S.Ct. 1868; *State v. Smith*, 329 S.C. 550, 556, 495 S.E.2d 798, 801 (Ct.App.1998). The issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. *Terry*, 392 U.S. at 27, 88 S.Ct. 1868; *Smith*, 329 S.C. at 556, 495 S.E.2d at 801.

"Reasonable suspicion is a lesser standard than probable cause and allows an officer to effectuate a stop when there is some objective manifestation of criminal activity involving the person stopped." *State v. Padgett*, 354 S.C. 268, 273, 580 S.E.2d 159, 162 (Ct.App.2003); *see also State v. Willard*, 374 S.C. 129, 134, 647 S.E.2d 252, 255 (Ct.App.2007). Probable cause for a warrantless arrest exists when the circumstances within the arresting officer's knowledge are sufficient to lead a reasonable person to believe that a crime has been committed by the person being arrested. *State v. Baccus*, 367 S.C. 41, 49, 625 S.E.2d 216, 220 (2006); *State v. Moultrie*, 316 S.C. 547, 552, 451 S.E.2d 34, 37 (Ct.App.1994). We discussed probable cause in the case of *State v. Blassingame:*

> The fundamental question in determining the lawfulness of an arrest is whether probable cause existed to make the arrest. *Wortman v. City of Spartanburg*, 310 S.C. 1, 425 S.E.2d 18 (1992). "Probable cause is defined as a good faith

belief that a person is guilty of a crime when this belief rests on such grounds as would induce an ordinarily prudent and cautious person, under the circumstances, to believe likewise." *Id.* at 4, 425 S.E.2d at 20. Probable cause may be found somewhere between suspicion and sufficient evidence to convict. *Thompson v. Smith*, 289 S.C. 334, 336–37, 345 S.E.2d 500, 502 (Ct.App.1986), *overruled in part on other grounds by Jones v. City of Columbia*, 301 S.C. 62, 389 S.E.2d 662 (1990). In determining the presence of probable cause for arrest, the probability cannot be technical, but must be factual and practical considerations of everyday life on which reasonable, prudent and cautious men, not legal technicians, act. *Gist v. Berkeley County Sheriff's Dep't*, 336 S.C. 611, 521 S.E.2d 163 (Ct.App.1999). *State v. Blassingame*, 338 S.C. 240, 250, 525 S.E.2d 535, 540–541 (Ct.App.1999).

## IV. United States Supreme Court Analysis

In *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), the United States Supreme Court elucidated when encounters between police officers and citizens rise to the level of seizures and arrests. In *Hodari D.*, two police officers were patrolling a high crime area when they observed several youths gathered around a parked car. As the officers approached in their unmarked police car, the group panicked and scattered. One member of the group, Hodari, fled the scene on foot and an officer chased after him. As Hodari ran, he looked to his rear and did not see his pursuer until directly before he was apprehended. Upon seeing the officer and moments prior to being tackled and handcuffed, Hodari tossed away a small rock which was later determined to be crack cocaine.

The issue in *Hodari D.* revolved around when a seizure occurs within the meaning of the Fourth Amendment. Hodari contended if he were seized at the time he discarded the drugs, this evidence is barred as the fruit of an illegal seizure since the officers lacked the reasonable suspicion required to stop him for questioning. However, the Court disagreed with this argument and determined Hodari was seized at the moment he was tackled, not during the pursuit leading up to the tackle. Therefore, the cocaine discarded during the pur-

suit was not the product of an illegal seizure because a seizure had not yet taken place when it was abandoned. *Id.* at 629, 111 S.Ct. 1547.

In reaching this conclusion, the Supreme Court expounded on what an arrest is under our Constitution:

To constitute an arrest, however—the quintessential "seizure of the person" under our Fourth Amendment jurisprudence—the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, was sufficient. *See, e.g., Whithead v. Keyes,* 85 Mass. 495, 501 (1862) ("[A]n officer effects an arrest of a person whom he has authority to arrest, by laying his hand on him for the purpose of arresting him, though he may not succeed in stopping and holding him"); 1 Restatement of Torts § 41, Comment *h* (1934). As one commentator has described it:

"There can be constructive detention, which will constitute an arrest, although the party is never actually brought within the physical control of the party making an arrest. This is accomplished merely by touching, however slightly, the body of the accused, by the party making the arrest and for that purpose, although he does not succeed in stopping or holding him even for an instant; as where the bailiff had tried to arrest one who fought him off by a fork, the court said, 'If the bailiff had touched him, that had been an arrest. . . .' " A. Cornelius, *Search and Seizure,* 163–164 (2d ed.1930) (footnote omitted).

To say that an arrest is effected by the slightest application of physical force, despite the arrestee's escape, is not to say that for Fourth Amendment purposes there is a *continuing* arrest during the period of fugitivity. If, for example [the officer] had laid his hands upon Hodari to arrest him, but Hodari had broken away and had *then* cast away the cocaine, it would hardly be realistic to say that that disclosure had been made during the course of an arrest. *Cf. Thompson v. Whitman,* 18 Wall. 457, 471, 21 L.Ed. 897 (1874) ("A seizure is a single act, and not a continuous fact").

. . .

Hodari contends (and we accept as true for purposes of this decision) that [the officer's] pursuit qualified as a "show of authority" calling upon Hodari to halt. The narrow question before us is whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield. We hold that it does not.

The language of the Fourth Amendment, of course, cannot sustain respondent's contention. The word "seizure" readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful. ("She seized the purse-snatcher, but he broke out of her grasp.") It does not remotely apply, however, to the prospect of a policeman yelling "Stop, in the name of the law!" at a fleeing form that continues to flee. That is no seizure. Nor can the result respondent wishes to achieve be produced—indirectly, as it were—by suggesting that [the officer's] uncomplied-with show of authority was a common-law arrest, and then appealing to the principle that all common-law arrests are seizures. An arrest requires *either* physical force (as described above) *or*, where that is absent, *submission* to the assertion of authority.

> "Mere words will not constitute an arrest, while, on the other hand, no actual, physical touching is essential. The apparent inconsistency in the two parts of this statement is explained by the fact that an assertion of authority and purpose to arrest followed by submission of the arrestee constitutes an arrest. There can be no arrest without either touching or submission." Perkins, *The Law of Arrest*, 25 Iowa L.Rev. 201, 206 (1940) (footnotes omitted).

*Hodari D.*, 499 U.S. at 624–627, 111 S.Ct. 1547.

The Court clearly defined an arrest for Fourth Amendment purposes as requiring the application of physical force or a submission to a show of authority. A suspect must yield to police demands or be physically restrained—if one of these elements is lacking, then an arrest has not been consummated. Hodari was not restrained, had not been physically touched, and did not submit to a show of authority at the time he discarded the drugs. Therefore, he had not yet been arrested until the point physical force was applied through the officer's

tackle. *Id.* at 629, 111 S.Ct. 1547 ("[A]ssuming that [the officer's] pursuit in the present case constituted a 'show of authority' enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled.")

In reaching the decision in *Hodari D.,* the Supreme Court cited to another important case addressing when a seizure or arrest has occurred, *Brower v. Inyo County,* 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). In *Brower,* a suspect in a stolen car fled from police pursuit during a lengthy high-speed chase. The chase ended when the suspect crashed into a police roadblock and was killed. His heirs challenged the roadblock as an unreasonable seizure contrary to Fourth Amendment protections, but the Ninth Circuit Court of Appeals found no seizure had taken place. The Supreme Court disagreed and, finding the roadblock was a seizure, remanded the case for additional consideration regarding reasonableness.

In making this determination, the Court explicated on when the seizure in the case actually transpired:

It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied.*

. . .

The pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit; and though he was in fact stopped, he was stopped by a different means—his loss of control of his vehicle and the subsequent crash. If, instead of that, the police cruiser had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure.

*Id.* at 596–597, 109 S.Ct. 1378.

The roadblock was responsible for stopping the suspect's flight, not the show of authority from the flashing lights of the

pursuing police vehicles. The Court's holding illustrates that a mere show of authority, without more, is not enough to constitute a seizure or arrest. As noted, had one of the pursuing officers attempted to ram the suspect's vehicle in order to stop it, this would have equated to a seizure. However, the pursuit was not enough in itself to terminate the freedom of movement of the suspect and did not rise to the level of a seizure without his submission to the pursuers' show of authority.

Following *Hodari D.*, the Supreme Court further examined when a seizure or arrest occurs in *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). In this case, police responded to a call about a fight in progress. As one of the officers returned to his patrol car, two boys uninvolved in the fight approached the scene on a motorcycle at a high rate of speed. The officer turned on his flashing lights, commanded the boys to stop, and repositioned his patrol car in an effort to block the motorcycle. Instead of stopping, the boys maneuvered around the police cars and sped away. Another officer chased after the boys at high speed. The chase ended when the motorcycle tipped over and its occupants were thrown off. The pursuing officer then accidently struck and killed one of the boys while attempting to stop the patrol car.

In a due process analysis to determine police liability for the boy's death, the Court noted that no seizure had materialized during the pursuit of the motorcycle. *Id.* at 843, 118 S.Ct. 1708 ("The Fourth Amendment covers only 'searches and seizures,' neither of which took place here." (quoting *Brower*, 489 U.S. at 597, 109 S.Ct. 1378)). The Court cited to both *Hodari D.* and *Brower* in concluding that a police pursuit in an attempt to seize a suspect does not amount to an actual seizure under the Fourth Amendment. *Lewis*, 523 U.S. at 844, 118 S.Ct. 1708. Because the boys did not pull over in response to the flashing lights and no intentional contact was made to effectuate a stop, no seizure resulted from the officer's conduct. *Id.* Furthermore, even though the officer struck one of the boys while trying to halt his vehicle, the Court determined a seizure did not occur because this contact was accidental. *Id.* ("[N]o Fourth Amendment seizure would take place when a 'pursuing police car sought to stop the

suspect only by the show of authority represented by flashing lights and continuing pursuit,' but accidently stopped the suspect by crashing into him."). The case establishes police pursuit is not enough to constitute a seizure or arrest absent intentional physical contact or a submission to a show of authority.

More recently, the Supreme Court reaffirmed the holding from *Hodari D.* in *Brendlin v. California*, 551 U.S. ——, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). In this case, police officers saw a car with expired registration tags. Before the officers pulled the car over, they had discovered through dispatch that a registration renewal was being processed and had noticed a temporary operating permit indicating it was legal to drive the vehicle through the end of the month. The officers decided to stop the vehicle in order to verify the permit matched the vehicle. There was nothing suspicious about the permit or the way it was affixed to the car at the time of the stop. After the vehicle was pulled over, one of the officers recognized the passenger, Brendlin, as a possible parole violator. As he verified this information, he saw Brendlin open and close the door of the car. The officer then approached the car, ordered Brendlin out at gunpoint, and placed him under arrest. In a search incident to this arrest, the officers found evidence related to the manufacture of methamphetamines.

The issue before the Court was whether the evidence collected was the fruit of an illegal seizure. The Court determined "[a] person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement." *Id.*, 127 S.Ct. at 2405 (quoting *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968))). Furthermore, "[a] police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin*, 127 S.Ct. at 2405. The Court held that a passenger is seized at the moment the car comes to a halt. *Id.*, 127 S.Ct. at 2403. As soon as the driver

pulled his car over in response to the police presence, a seizure of all occupants of the vehicle was completed. This case is important because it further clarifies a seizure occurs when an individual submits to a show of authority, including when that person is a passenger in a submitting vehicle. *Id.*, 127 S.Ct. at 2403 ("Brendlin was seized from the moment [the driver's] car came to a halt on the side of the road, and it was error to deny his suppression motion on the ground that seizure occurred only at the formal arrest.").

From *Hodari D.* and the chain of cases that followed, two factors essential to an arrest have been identified: (1) physical contact intended to effect restraint or (2) submission to a show of authority. An arrest, the highest form of seizure possible under the Fourth Amendment, occurs when a police officer physically restrains a suspect or forces submission through a show of authority. *Hodari D.*, 499 U.S. at 624, 111 S.Ct. 1547. A seizure or arrest has not been effected when a suspect flees from an officer—whether the flight be on foot, in an automobile, or on a motorcycle—even if there has been a show of authority or command to stop without submission. *See Lewis*, 523 U.S. at 843–844; *Hodari D.*, 499 U.S. at 626, 111 S.Ct. 1547; *Brower*, 489 U.S. at 597, 109 S.Ct. 1378. Without one of these factors, an arrest has not yet occurred. Embracing this proposition and the holdings in these United States Supreme Court cases, fleeing from an officer's command to stop does not yet rise to an arrest for Fourth Amendment purposes absent submission to the order.

In the case *sub judice,* Brannon's response to spotting the police was identical to the actions of Hodari in a similar situation. When Brannon saw officers approaching him, he turned and fled, just like Hodari did when he observed a police presence. Additionally, like the boys on the motorcycle in *Lewis,* Brannon chose to ignore the officer's commands to stop and continued his flight. In both *Hodari D.* and *Lewis,* the Supreme Court determined no arrest or seizure had occurred during these flights. *See Lewis,* 523 U.S. at 843, 118 S.Ct. 1708; *Hodari D.,* 499 U.S. at 629, 111 S.Ct. 1547. Therefore, it appears consistent to conclude that no arrest occurred in the present case during the course of Brannon's flight. Looking to the factors for an arrest enunciated by the

Supreme Court, Brannon had neither been physically touched for the purpose of restraint nor had he submitted to a show of authority at the time of his flight. Therefore, no arrest or seizure had occurred at the time of Brannon's alleged resistance.

## V. Resisting Arrest under Section 16–9–320(A)

▮ Brannon was convicted for a violation of South Carolina Code Section 16–9–320(A) which provides:

It is unlawful for a person knowingly and wilfully to oppose or resist a law enforcement officer in serving, executing, or attempting to serve or execute a legal writ or process or to resist an arrest being made by one whom the person knows or reasonably should know is a law enforcement officer, whether under process or not. A person who violates the provisions of this subsection is guilty of a misdemeanor and, upon conviction, must be fined not less than five hundred dollars nor more than one thousand dollars or imprisoned not more than one year, or both.

An "arrest" is defined by *Black's Law Dictionary* as "1. A seizure or forcible restraint. 2. The taking or keeping of a person in custody by legal authority, esp. in response to a criminal charge." Black's Law Dictionary 104 (7th ed.1999).

Whether fleeing a police officer's simple demand to stop constitutes resisting arrest under Section 16–9–320(A) is a novel question. South Carolina case law has recognized that an arrest is an ongoing process, finalized only when the defendant is properly confined. *State v. Dowd,* 306 S.C. 268, 270, 411 S.E.2d 428, 429 (1991). However, there is a paucity of law defining when an arrest begins.

In *State v. Williams,* 237 S.C. 252, 116 S.E.2d 858 (1960), Williams was convicted of robbery, grand larceny and assault with a deadly weapon. While detained by a highway patrol officer investigating the possession of contraband liquor, Williams "suddenly caught him by the arm and after a struggle took his pistol from the holster." *Id.* at 256, 116 S.E.2d at 860. The supreme court discussed whether Williams was under arrest when he took the officer's weapon:

So far as appellant is concerned, the only act of the patrolman prior to that time was to request him to get out of the

car. This cannot be said as a matter of law to amount to an arrest. 'To constitute an arrest, there must be an actual or constructive seizure or detention of the person, performed with the intention to effect an arrest and so understood by the person detained.' *Jenkins v. United States,* 10 Cir., 161 F.2d 99, 101 [1947]. It is not necessary 'that there be an application of actual force, or manual touching of the body, or physical restraint which may be visible to the eye, or a formal declaration of arrest; it is sufficient if the person arrested understands that he is in the power of the one arresting and submits in consequence. However, in all cases in which there is no manual touching or seizure or any resistance, the intentions of the parties to the transaction are very important; there must have been intent on the part of one of them to arrest the other, and intent on the part of such other to submit, under the belief and impression that submission was necessary. There can be no arrest where the person sought to be arrested is not conscious of any restraint of his liberty.' 4 Am.Jur., *Arrest,* Section 2. Also, *see* 6 C.J.S. *Arrest* § 1; Restatement, Torts, Section 112.

*Williams,* 237 S.C. at 257, 116 S.E.2d at 860–861.

In a case where two African American students were arrested for trespass and breach of the peace, and one of them was charged with resisting arrest, for sitting at a drug store's restaurant whose policy was to not serve African Americans, the supreme court considered whether a delay in responding to a police officer's instruction constituted resisting arrest. *City of Columbia v. Bouie,* 239 S.C. 570, 124 S.E.2d 332 (1962), *overruled on other grounds,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). The court illuminated:

[T]he evidence was in our opinion insufficient to warrant Bouie's conviction on the charge of resisting arrest. It is apparent from the testimony of the arresting officer that the only 'resistance' on Bouie's part was his failure to obey immediately the officer's order, with the result that the latter 'had to pick him up out of the seat'. Resisting arrest is one form of the common law offense of obstructing justice; and the use of force is not an essential ingredient of it. But we do not think that such momentary delay in responding to the officer's command as is shown by the

testimony here amounted to 'resistance' within the intent of the law.

*Id.*, 239 S.C. at 574, 124 S.E.2d at 333 (citations omitted).

In *Fernandez v. State*, 306 S.C. 264, 411 S.E.2d 426 (1991), Fernandez was standing in a group of people approached by police officers. Fernandez broke from the group and ran, carrying two packages. As the police pursued him, Fernandez dropped the two packages. The officers eventually caught and subdued Fernandez, and they returned to retrieve the packages he abandoned. One package contained $13,000 and the other crack cocaine. *Id.* at 266, 411 S.E.2d at 427.

The South Carolina Supreme Court upheld the admission into evidence of the contents of the packages Fernandez dropped:

> In *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), a case with remarkably similar facts to the present case, the United States Supreme Court held that the defendant was not seized for Fourth Amendment purposes until he submitted to the authorities. *Id.*, 499 U.S. at [629], 111 S.Ct. at 1552, 113 L.Ed.2d at 699. Further, defendant abandoned the evidence while he was running from the police. *See Id.* It follows that evidence abandoned by the defendant before he was seized by the police cannot be the basis for a violation of the Fourth Amendment's prohibition against unreasonable search and seizure. *Id.* We find no error in the admission of evidence so obtained.

*Fernandez*, 306 S.C. at 266–267, 411 S.E.2d at 427–428.

Section 16–9–320(A) requires that there be an "arrest being made" in order to support a conviction. The statute does not criminalize fleeing from officers attempting to conduct a *Terry* stop. There is no allegation Brannon "oppose[d] or resist[ed] a law enforcement officer in serving, executing, or attempting to serve or execute a legal writ or process." His conviction was founded upon "resist[ing] an arrest being made by one whom the person knows or reasonably should know is a law enforcement officer." By the clear, unambivalent language of the statute, a conviction for the offense can only stand if there was indeed an arrest being made. It follows that since there is no seizure for Fourth Amendment purposes when an indi-

vidual flees approaching officers, there certainly cannot be an arrest.

## VI.  Other Jurisdictions' Resisting Arrest Statutes

Prior to a later amendment of its relevant statute, Missouri's criteria for sustaining a resisting arrest conviction shared with South Carolina Code Section 16–9–320(A) the requirement that an offender knowingly resists an arrest being made.

In *State v. Long*, 802 S.W.2d 573 (Mo.Ct.App.1991), the Missouri Court of Appeals found a conviction for resisting arrest was not supported by sufficient evidence.  At the time of trial, the Missouri statute declared, in pertinent part:

1. A person commits the crime of resisting ... arrest if, knowing that a law enforcement officer is making an arrest, for the purpose of preventing the officer from effecting the arrest, he:

    (1) Resists the arrest of himself by ... fleeing from such officer....

Mo.Rev.Stat. § 575.150 (1986).

In *Long*, a police officer followed Long intending to stop him for an expired license plate.  After Long began to accelerate his truck, the officer activated his lights and siren, pursued Long, and stopped after Long pulled into a driveway.  Long exited his truck when the officer arrived.  After being advised that he was being arrested for various charges including resisting arrest, Long offered no opposition.

At trial, the arresting officer testified when he saw the expired plate he intended to "stop the pickup and investigate...." *Long*, 802 S.W.2d at 575.  He said he formed the intent to place Long under arrest "when I determined he was actively fleeing from me." *Id.* Long moved for an acquittal arguing the state failed to prove (1) Long knew the officer was making an arrest and (2) the officer intended to arrest him prior to flight.

The court said the officer could not have formed the intent to arrest Long for the registration offense without first confirming Long was the owner as required by Missouri law.  Long was additionally charged with not having a driver's

license. This fact, discovered after Long stopped, could not have supplied an intent to arrest prior to the chase. The court held:

> [T]he sequence of events, viewed in the light most favorable to the judgment, was (a) the officer commenced pursuit of the defendant without any intent to arrest him, (b) the defendant fled from the officer, and (c) the officer formed an intent to arrest the defendant when he "determined [the defendant] was actively fleeing from me." There was no evidence at trial identifying the crime for which he intended to arrest the defendant. While we are sympathetic with the view that such a sequence of events might constitute a crime, we are convinced that the state failed to prove that the defendant violated § 575.150. The statute creates the crime of resisting arrest by flight; it does not create the crime of fleeing from a traffic stop where no arrest was intended until after flight commenced.

*Id.* at 577.

> Missouri's amended statute now reads:
>
> 1. A person commits the crime of resisting or interfering with arrest, detention, or stop if, knowing that a law enforcement officer is making an arrest, or attempting to lawfully detain or stop an individual or vehicle, or the person reasonably should know that a law enforcement officer is making an arrest or attempting to lawfully detain or lawfully stop an individual or vehicle for the purpose of preventing the officer from effecting the arrest, stop or detention, the person:
>
> (1) Resists the arrest, stop or detention of such person by using or threatening the use of violence or physical force or by fleeing from such officer; . . . .

Mo.Rev.Stat. § 575.150 (2006).

In the case at bar, evidence was entered indicating Brannon was suspected of breaking and entering automobiles. However, Scruggs testified he wanted to stop Brannon and question him. Similar to *Long,* the intent to arrest was formulated after Brannon fled. While the *Long* court never reached the argument that the prosecution failed to prove Long knew the officer was making an arrest, a footnote suggested that a conviction could stand where the intent to arrest is formed

during pursuit if a crime were committed in the officer's presence, or if he learned of an arrest warrant over the radio. *Long,* 802 S.W.2d at 577, n. 4.

The Texas Court of Criminal Appeals considered whether a person who fled from an officer intending an investigatory stop evaded arrest in *Smith v. State,* 739 S.W.2d 848 (Tex. Crim.App.1987) (*en banc*). At the time of Smith's conviction, Texas Penal Code Section 38.04 provided "a person commits the offense of evading arrest if he intentionally flees from a person he knows is a peace officer attempting to arrest him." "The gravamen of the offense is the evasion of an arrest, not the evasion of a police officer." *Smith,* 739 S.W.2d at 850 (quoting *Jackson v. State,* 718 S.W.2d 724, 726 (Tex.Crim.App. 1986)). Section 38.04 currently states "[a] person commits an offense if he intentionally flees from a person he knows is a peace officer attempting to lawfully arrest *or detain* him." Tex. Penal Code Ann. § 38.04 (Vernon 2003) (emphasis added).

In *Smith,* an officer was dispatched to a club after a disturbance was reported. Without knowing what had occurred inside, the officer was met outside by three women who told him Smith had a gun. Smith, who was in the doorway, ran from the scene. After chasing Smith while yelling "Halt, Police!", Smith was apprehended. The officer determined Smith was intoxicated, and he was arrested for that offense. The court held Smith fled when the officer was trying to investigate to determine if the crime of unlawfully possessing a gun had occurred. "[Section] 38.04 ... requires that before a violation of that statute can occur, when the individual flees from the officer, the officer must then be *attempting to arrest him.*" *Smith,* 739 S.W.2d at 853 (emphasis in original). The court concluded the state failed to prove Smith violated Section 38.04. "[F]leeing from a request for a *Terry*-type stop, while not behavior we condone in any way, does not constitute the crime of resisting arrest." *Id.* at 851.

The Appeals Court of Massachusetts considered whether a defendant's flight from officers who had not yet spoken with him supported a conviction for resisting arrest. *Commonwealth v. Grant,* 71 Mass.App.Ct. 205, 880 N.E.2d 820 (2008). Police officers saw Grant's car traveling down a road and,

knowing of an outstanding warrant, they began to follow. Before they could turn on their lights or sirens, Grant abruptly pulled over, leapt from the car, and fled on foot. He led the officers at a full sprint through several yards and was seen placing a gun inside a backyard grill. Eventually he ran in the direction of another responding officer who drew his gun and ordered Grant to "get on the ground." Grant instead changed direction and, after running into another officer who ordered him to the ground, Grant submitted. *Id.* at 823.

Grant was convicted of resisting arrest. On appeal he argued insufficient evidence supported his conviction. The court noted the relevant law declared:

A defendant resists arrest if "he knowingly prevents or attempts to prevent a police officer, acting under color of his official authority, from effecting an arrest of the actor or another; by: (1) using or threatening to use physical force or violence against the police officer or another; or (2) using any other means which creates a substantial risk of causing bodily injury to such police officer or another."

*Id.* at 823 (quoting Mass. Gen. Laws. Ann. ch. 268, § 32B(a)).

The court explained " 'the crime [of resisting arrest] is committed, if at all, at the time of the 'effecting' of an arrest.' " *Id.* (quoting *Commonwealth v. Grandison*, 433 Mass. 135, 741 N.E.2d 25 (2001)). Under Massachusetts jurisprudence, an arrest is effected when there is (1) an actual or constructive seizure or detention of the person, (2) made with an intent to arrest, and (3) the person detained so understands. *Id.* "The standard for determining whether a defendant understood that he is being arrested is objective—whether a reasonable person in the defendant's circumstances would have so understood." *Id.*

In *Grant*, the court considered the timing of events critical to the analysis: "When [Grant] first fled, he had not been actually or constructively seized or detained. The police had not told him to stop, nor informed him that he was under arrest.... Although it was clear that he ran to avoid and evade the police, avoiding and evading the police was not the equivalent of resisting arrest, particularly when the police had not spoken to [Grant] before he ran away." *Grant*, 880 N.E.2d at 823–24. Concerning the first element of effecting

an arrest, the court suggested that during the pursuit, the functional equivalent of a seizure may have arisen at some point. The police knew Grant had an outstanding warrant and testified they intended to arrest him. However, the Commonwealth had to prove that "a reasonable person in [Grant's] position would have understood that the seizure was to effect an arrest." *Id.* at 824. The court found such evidence lacking: "Other than chasing the defendant, the officers did not communicate with him in any way until right before he submitted." *Id.* "During the defendant's flight from the police, there was no evidence to prove that he understood that the officers were effecting an arrest. He was simply running away from them." *Id.*

> Fleeing from, or even resisting, a stop or patfrisk does not constitute the crime of resisting arrest. Although the officers here were intending to effect an arrest, and not just stop or patfrisk, neither their words nor their actions had objectively communicated that intention to the defendant prior to, or during, the pursuit. We believe such communication is required to satisfy the requirement that a defendant understand he is being arrested.

*Id.* (internal citations omitted).

Likewise, the Court of Appeals of Ohio found evidence insufficient to support a resisting arrest conviction in *State v. Raines*, 124 Ohio App.3d 430, 706 N.E.2d 414 (1997). An officer observed Raines lean into a running parked car and then place something into his shoe. The officer, who was on bicycle patrol in a high crime area, approached Raines and told him to stop because he needed to speak with him, but Raines fled. With the officer commanding him to stop and telling him he was under arrest, Raines ran into an apartment building to hide. *Id.* at 415. He was apprehended shortly thereafter and charged with resisting arrest among other offenses.

Resisting arrest is codified at Ohio's Revised Code 2921.33(A) which states "no person recklessly or by force, shall resist or interfere with a lawful arrest of the person or another."

> A lawful arrest is an element of this offense. Although the officer testified that he chased Raines and told Raines to

stop because he was under arrest, this was not so. " '[A]n officer effects an arrest of a person whom he has authority to arrest by laying his hand on him for the purpose of arresting him, though he may not succeed in stopping and holding him.' "

*Raines,* 706 N.E.2d at 415 (quoting *California v. Hodari D.,* 499 U.S. 621, 624, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)).

In a case distinguishing between "resisting" and "avoiding", a defendant convicted of resisting arrest under Arizona's statute argued his fleeing by motorcycle from pursuing officers did not constitute a violation as defined by statute. *State v. Womack,* 174 Ariz. 108, 847 P.2d 609 (1993). The police attempted to pull Womack over for having no taillight, but Womack instead initiated a chase lasting several miles. Once stopped, the arrest was made without further incident. Arizona's resisting arrest statute expressed the offense:

A. A person commits resisting arrest by intentionally preventing or attempting to prevent a person reasonably known to him to be a peace officer, acting under color of such peace officer's official authority, from effecting an arrest by:

1. Using or threatening to use physical force against the peace officer or another; or

2. Using any other means creating a substantial risk of causing physical injury to the peace officer or another.

Ariz.Rev.Stat. § 13–2508 (2001).

Charged under section A(2), Womack contended fleeing did not create a factual basis for the offense. The court first determined the intent of the statute was to prohibit "assaultive behavior directed toward an arresting officer, not an arrestee's efforts to put as much space between himself and the officer." *Womack,* 847 P.2d at 612. Additionally, they noted another Arizona statute more appropriately addressed and prohibited flight from a pursuing law enforcement vehicle. However, concerning flight in conjunction with the resisting arrest statute, the court inculcated:

[T]he defendant's flight was conduct which prevented, without the use of resistance, the effectuation of his arrest. In other words, such conduct constituted avoiding arrest, not resisting arrest. This interpretation of the statute flows

from what we deem to be a common sense application of the ordinary meaning of the statutory language.

. . .

Because we label defendant's conduct as avoiding arrest rather than resisting arrest, we deem it appropriate to define those terms as we apply them herein. *Webster's Ninth New Collegiate Dictionary* 1003 (1988) defines "resist" as follows: "to exert force in opposition"; "to exert oneself so as to counteract or defeat," "to withstand the force or effect of." "Resistance" is defined similarly as "an opposing or retarding force." *Id.*

In defining "resist" as applied to the state's resisting arrest statute, the Appellate Division of the Circuit Court of Connecticut stated that "[t]he word ["resist"] is derived from the Latin, its etymological meaning being "to stand against" or "to withstand." It is the opposition of force to force.... *There must be actual opposition or resistance,* making necessary, under the circumstances, the use of force." *State v. Avnayim,* 1 Conn.Cir.Ct. 348, 24 Conn. Supp. 7, 185 A.2d 295, 298–99 (1962) (emphasis added).

"Avoid" on the other hand, is defined as "to depart or withdraw from" or to "keep away from." *Webster's Ninth New Collegiate College Dictionary* 120 (1988). In analyzing defendant's conduct, it appears to us that "avoiding arrest" most accurately describes his actions as he fled from the officers. When an individual is the object of an attempt to effect his or her arrest, the individual may submit to the arrest, avoid the arrest, or resist the arrest. Only the latter conduct constitutes the statutory offense of resisting arrest.

*Womack,* 847 P.2d at 613. Applying this analysis to the present case, Brannon was not being placed under arrest. Instead, borrowing from the reasoning of the Arizona Court of Appeals, his running from the officers' command to "stop" amounts only to avoidance of the officers.

In the present case, the State argues other states have held that where officers intend to arrest an individual who then flees in anticipation, convictions of obstruction or resisting arrest without violence have been supported. For example, the State quotes from *Wester v. State,* 224 Ga.App. 495, 480 S.E.2d 921 (1997):

The evidence was sufficient to support Wester's conviction for misdemeanor obstruction of an officer ... the record shows that Wester fled from officers after they identified themselves. " 'Under that evidence, the jury was authorized to infer that [Wester] knew that a police officer was attempting to perform his official duty ... and to find that [Wester] deliberately took action to delay, hamper or impede the officer in the performance of his duty.' [Cit.]"

*Id.* at 923.

However, Georgia Code Section 16–10–24(a) does not require an arrest being made, but instead states in part:

[A] person who knowingly and willfully obstructs or hinders any law enforcement officer *in the lawful discharge of his official duties* is guilty of a misdemeanor.

Ga.Code Ann. § 16–10–24(a) (emphasis added). Unlike South Carolina Code Section 16–9–320(A), Georgia's statute applies to a broader range of interactions with law enforcement officers. *See, e.g., Davis v. State,* 288 Ga.App. 66, 653 S.E.2d 358 (2007) (defendant guilty of obstruction of an officer under § 16–10–24(a) for replacing barricade across a road after officer earlier removed barricade and told him not to reconstruct it); *Wynn v. State,* 236 Ga.App. 98, 511 S.E.2d 201 (1999) (police officer questioning teen about open beer can in car was acting within the scope of his official duties).

Another example of a statute that operates to criminalize not only resisting arrest but flight from investigatory stops can be found in North Carolina General Statutes Section 14–223 which propounds:

If any person shall willfully and unlawfully resist, delay or obstruct a public officer in discharging or attempting to discharge a duty of his office, he shall be guilty of a Class 2 misdemeanor.

N.C. Gen.Stat. § 14–223 (2005).

In *State v. Lynch,* 94 N.C.App. 330, 380 S.E.2d 397 (1989), a defendant tried to run from and struggled with officers who were trying to determine his identity. He was charged with violation of Section 14–223, and the court clarified:

The conduct proscribed under G.S. 14–223 is not limited to resisting an arrest but includes any resistance, delay, or

obstruction of an officer in the discharge of his duties.... [D]efendant's conviction may be based upon his conduct prior to the time his actual arrest.

*Id.* at 398.

South Carolina Code Section 16–9–320(A), plainly requires that an arrest is being made. To stretch the current statute to cover flight from an attempted investigatory stop would violate the rule that it is not the court's place to change the meaning of a clear and unambiguous statute. *See City of Camden v. Brassell*, 326 S.C. 556, 561, 486 S.E.2d 492, 495 (Ct.App.1997) ("Where the language of the statute is clear and explicit, the court cannot rewrite the statute and inject matters into it which are not in the legislature's language.").

## *CONCLUSION*

A priori, there must be an arrest before there can be a conviction of resisting arrest. The videlicet of the statutory offense of resisting arrest is the existence of a lawful arrest. Prefatorily, a prosecution for resisting arrest fails if there is no arrest of the offender. The officers in the case at bar were in an investigatory phase when Brannon ran. No arrest was being made at the time of his flight as is required by Section 16–9–320(A). While the officers testified to their suspicions of a crime being committed, Scruggs admitted they initially wanted to question Brannon.

We understand the State's concerns should suspects be permitted to flee a scene. However, this court is indubitably constrained to apply the law as written. The statute does not extend to investigatory stops or detentions, and such inclusions cannot be implied by this court. The trial judge erred in denying Brannon's motion for a directed verdict on the resisting arrest charge.

Accordingly, the decision of the circuit court is

**REVERSED.**

SHORT, J., concurs.

KITTREDGE, J., dissents in a separate opinion.

KITTREDGE, J., dissenting:

I respectfully dissent. Based on the record before us, I believe the trial court properly denied Ricky Brannon's directed verdict motion as to the resisting arrest charge. I vote to affirm.

During the early morning hours of April 21, 2003, Ricky Brannon went to the Westwood Apartments in Gaffney, South Carolina, for the purpose of breaking in vehicles. Maria Rainey, a resident of the apartment complex, looked outside and noticed that the interior light of her car was on. Brannon was inside Rainey's vehicle. Rainey called 911. Gaffney city police officers Michael Scruggs and Randy Quinn were dispatched to the Westwood Apartments.

The 911 dispatcher coordinated communications. Rainey informed the police dispatcher that Brannon had broken in another car, a Ford Explorer. Officers Scruggs and Quinn were alerted to the break-in of the Explorer as they arrived. The officers parked a short distance away and quietly approached the crime in progress. As the uniformed officers rounded the corner to Building 800 of the apartment complex, they observed Brannon next to the Explorer—the door was open and the car's interior light was on. Brannon saw the uniformed officers and immediately bolted. The officers gave chase, shouting "stop, police!" Brannon continued to flee and disregarded the officers' commands to stop, but he was ultimately apprehended in front of Building 1100 of the complex, about 300 yards from where the pursuit began.

Brannon was convicted on all charges, yet the sole issue before us is whether, viewing the evidence in a light most favorable to the State, there was any evidence that Brannon's attempt to avoid police detention falls within our resisting arrest statute, section 16–9–320 of the South Carolina Code (2003). Based on the directed verdict grounds asserted in the trial court, together with the unchallenged jury charge, I would affirm the denial of the directed verdict motion.

The majority has expanded upon Brannon's directed verdict motion, as well as his final brief. I am not aware of any rule or procedure which allows this Court to expand an appellant's argument to justify a reversal of the trial court.

In moving for a directed verdict and arguing an arrest never took place, Brannon's counsel argued:

I would move for a directed verdict on the resisting arrest count because both officers testified that they never told Mr. Brannon or said he or tried, attempted to place him under arrest until after they caught him. They just came up on him, stop police, he took off running, they ran after him. There was never any stop police, you're under arrest. In fact, one officer testified that he, they weren't going to place him under arrest until they were actually able to talk to him and determine what went on.

So, I would move for a directed verdict on the resisting arrest based on the fact that he was never placed under arrest.

As counsel summarized his position, he told the trial court, "Now, if he says stop, you're under arrest, you have to stop at that point in time. You're resisting arrest if he says you're under arrest. But just stop by itself is not sufficient to give grounds for resisting arrest." This was the heart of counsel's closing argument to the jury: "Did they ever place him under arrest? Did they ever say stop, you're under arrest? No, just stop police."

The argument presented in the trial court forms no basis for the rationale of the majority in reversing. Indeed, the majority relies on an exhaustive Fourth Amendment "seizure" analysis that is nowhere to be found in the record or Appellant's final brief. The majority opinion even refutes Brannon's concession at trial that "[y]ou're resisting arrest if [the officer] says you're under arrest." *Cf. State v. Williams*, 237 S.C. 252, 257, 116 S.E.2d 858, 860 (1960) (stating a formal declaration of arrest is not necessary to effectuate an arrest).

As for the jury charge, there was no definition or consideration of the statutory term "arrest." The only relevant term defined for the jury was "resist." [2] The trial court charged the jury: "Even peaceful nonviolent indirect obstruction of an arrest ... is considered resisting arrest. If the means used are sufficient to prevent the officer from making an arrest, the defendant is guilty of resisting arrest." There was no excep-

---

**2.** The jury was charged that "[r]esist means to oppose, strive against, or obstruct or obstruct by means to impede, hinder, or interfere with."

tion to the charge. When viewing the particular facts of this case juxtaposed to the unchallenged jury instruction, there is certainly evidence that Brannon's fleeing and disobeying the officers' commands to stop amounted to resisting an arrest.

I would, therefore, adhere to general principles of issue preservation and the law of the case doctrine to affirm the denial of the motion for directed verdict.

If this Court were free to refine and recast Brannon's arguments in the trial court and on appeal, I would still lean to affirm. As I will explain below, the essence of my position is that: (1) per South Carolina Supreme Court precedent, the term "arrest" in section 16–9–320 encompasses a process, not a single act; (2) under the common law, the process of an arrest does not necessarily require the application of actual force or manual touching of the body; and (3) under the particular facts and circumstances of this case, a reasonably prudent law enforcement officer had probable cause to arrest Brannon for the felony of breaking in a motor vehicle at the time of the initial encounter.

In light of the particular facts presented, I would construe the intent of the South Carolina General Assembly to include Brannon's conduct as resisting arrest under section 16–9–320(A), which states, "[i]t is unlawful for a person knowingly and wilfully . . . to resist an arrest being made by one whom the person knows or reasonably should know is a law enforcement officer, whether under process or not."

The term "arrest" is not defined in section 16–9–320. I would begin an assessment of statutory construction of section 16–9–320 with South Carolina case law. In *State v. Dowd,* 306 S.C. 268, 269–70, 411 S.E.2d 428, 429 (1991) the supreme court held an arrest is an ongoing process and affirmed Dowd's conviction of resisting arrest by blocking the jail cell door with his arm and leg when officers attempted to place Dowd in his cell. In *Dowd,* our supreme court cited with approval the North Carolina case of *State v. Leak,* which holds that an "arrest also includes 'bringing the person personally within the custody and control of the law.'" *State v. Leak,* 11 N.C.App. 344, 181 S.E.2d 224, 226 (1971) (quoting *Hadley v. Tinnin,* 170 N.C. 84, 86 S.E. 1017, 1019 (1915)).

The novel question before us is identifying the initiation of the arrest process. I read our supreme court's decision in *State v. Williams*, 237 S.C. 252, 116 S.E.2d 858 (1960) as recognizing that the concept of arrest is not a rigid and inflexible concept. The particular facts of each case are determinative.

The court in *State v. Williams* held that " '[t]o constitute an arrest, there must be an actual or constructive seizure or detention of the person, performed with the intention to effect an arrest and so understood by the person detained.' " 237 S.C. at 257, 116 S.E.2d at 860 (quoting *Jenkins v. United States*, 161 F.2d 99, 101 (10th Cir.1947)). The supreme court provided further guidance:

It is not necessary "that there be an application of actual force, or manual touching of the body, or physical restraint which may be visible to the eye, or a formal declaration of arrest; it is sufficient if the person arrested understands that he is in the power of the one arresting and submits in consequence. However, in all cases in which there is no manual touching or seizure or any resistance, the intentions of the parties to the transaction are very important; there must have been intent on the part of one of them to arrest the other, and intent on the part of such other to submit, under the belief and impression that submission was necessary. There can be no arrest where the person sought to be arrested is not conscious of any restraint of his liberty."

*State v. Williams*, 237 S.C. at 257, 116 S.E.2d at 860–61 (quoting 4 Am.Jur. *Arrest* § 2 (Supp.1960)).

*State v. Williams* analyzed the term "arrest" through a common law framework and that common law understanding of the term is entitled to weight. We are a common law state. "Resisting arrest is one form of the common law offense of obstructing justice; and the use of force is not an essential ingredient of it." *City of Columbia v. Bouie*, 239 S.C. 570, 574, 124 S.E.2d 332, 333 (1962), *revd on other grounds*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). In the absence of an express statutory definition, it is entirely reasonable for a South Carolina court to consider the common law meaning of the term "arrest" in discerning the legislative intent underlying section 16–9–320.

The posture of *State v. Williams* was an appeal from the denial of a directed verdict. The court held that, under the facts presented, it could not rule on the matter of arrest "as a matter of law." 237 S.C. at 257, 116 S.E.2d at 860. I would similarly decline to find error in this case in the trial court's refusal to direct a verdict. The above guideposts from *State v. Williams*—an arrest entails an actual or constructive seizure or detention of the person and does not always require application of force or manual touching, or a formal declaration of arrest—lead me to reject a rigid definition of arrest. As the majority observes, "Brannon had neither been physically touched for the purpose of restraint nor had he submitted to a show of authority at the time of his flight." These factors highlighted by the majority do not in my judgment remove the issue from one of fact (properly resolved by the jury) to one of law.

I acknowledge that a closer question is presented as to the intentions of the police officers, for *State v. Williams* instructs that in the absence of manual touching, "the intentions of the parties to the transaction are very important." 237 S.C. at 257, 116 S.E.2d at 860. Much is made of Officer Scruggs' testimony that he initially wanted to merely detain Brannon. Yet I believe the evidence, when viewed in a light most favorable to the State, permits an inference that Brannon was under "arrest." *See Id.* ("To constitute an arrest, there must be an actual or constructive seizure or detention of the person, performed with the intention to effect an arrest and so understood by the person detained.").

The officers' testimony reveals the following: based on the information received from the 911 dispatcher coupled with their observations of Brannon next to the Ford Explorer (with its door opened and inside light on), a reasonably prudent police officer would have cause to believe that Brannon was committing the felony of breaking into a motor vehicle. In fact, Officer Scruggs so stated when he was questioned about his belief upon his first sighting of Brannon:

Q: Did you believe [Brannon] was the individual that was breaking into cars?

A: Yes, sir.

Moreover, when cross-examined about the timing of the custodial arrest, Officer Scruggs stated that Brannon was *placed* under arrest "after we caught him." The testimony of Officer Quinn is similar, for he described the chase, observing that "Brannon ran this path here and the 1100 building is here and he was arrested right here." Officer Quinn was additionally asked, "what was your intention when the subject took off?" He responded, "Our intention was to approach the subject and find out exactly what he was doing there and at that time. We believe [sic] he was breaking into a motor vehicle and we placed him under arrest for that charge." Taking the officers' testimony as a whole, and construing it in a light most favorable to the State, I would find there was sufficient evidence of intent to arrest Brannon.[3]

It is the presence of probable cause to arrest for breaking in a motor vehicle (a class F felony) at the time of the initial encounter which lies at the core of my view that the process of arrest was underway when the officers caught Brannon in the act. Concerning probable cause, we are guided by Fourth Amendment jurisprudence. In this regard, an officer's "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). The proper inquiry is an objective one, based on what would a reasonable police officer believe under the same circumstances. *Id.* at 810–13. In this case, a reasonably prudent officer would have probable cause to arrest Brannon at the initial encounter. Brannon's location and conduct exactly matched the witness's description, as Brannon was standing next to the Ford Explorer with an open door in the otherwise deserted parking lot late at night.

The question of intent from Brannon's perspective is clear. Brannon was breaking into vehicles in an apartment complex in the middle of the night. When he was surprised by the two uniformed police officers, he ran and tried to avoid arrest. Any reasonably prudent person in Brannon's position would

---

3. This assessment is admittedly problematic, for the jury was never charged on the law of "arrest" under section 16–9–320. This difficulty highlights the soundness of issue preservation rules which are designed to ensure that the issues considered on appeal are the same ones raised in the trial court.

not have the slightest doubt that the pursuing officers intended to place him in custody. *See* 5 Am.Jur.2d *Arrest* § 4 (2007) ("Police detention constitutes an 'arrest' if a reasonable person in the suspect's position would understand the situation to be a restraint on freedom of the kind that the law typically associates with a formal arrest."). Without a doubt, Brannon was "conscious of [the] restraint of his liberty." *State v. Williams,* 237 S.C. at 257, 116 S.E.2d at 861.

An arrest is defined as depriving a "person of his liberty by legal authority." Black's Law Dictionary 109 (6th ed.1990). The definition continues to explain, "[a]ll that is required for an 'arrest' is some act by officer indicating his intention to detain or take person into custody and thereby subject that person to the actual control and will of the officer." *Id.* at 110. This comprehensive definition lines up with other authorities addressing the breadth and scope of the concept of arrest. *See* 6A CJS *Arrest* § 1 (2004) ("An arrest is the taking, seizing, or detaining the person of another by any act which indicates an intention to take him or her into custody and subject the person arrested to the actual control and will of the person making the arrest.").

I will respond briefly to other South Carolina cases cited by the majority. As an initial observation, neither the facts nor law of these cases warrants reversal of Brannon's conviction and sentence. The focus of *Bouie* was whether the defendant *resisted* arrest by a "momentary delay in responding to the officer's command." 239 S.C. at 574, 124 S.E.2d at 333. *Bouie* says nothing about the meaning of the term "arrest." *Id.* In *Fernandez v. State,* 306 S.C. 264, 265, 411 S.E.2d 426, 427 (1991), Fernandez was simply standing among a group of people. There was no reason to believe that Fernandez was engaged in any criminal activity. *Id.* Yet Fernandez ran as police officers approached, prompting the officers to pursue. *Id.* During the pursuit Fernandez discarded drugs. *Id.* The legal issue in Fernandez was determining at what point the defendant had been "seized" under the Fourth Amendment for purposes of ruling on his motion to suppress. *Id.* The meaning of the term "arrest" in section 16–9–320 played no role in *Fernandez. Id.*

I view the matter of legislative intent of the statutory term "arrest" under section 16–9–320 as a different proposition from the purely constitutional question of what constitutes a "seizure" under the Fourth Amendment. The concepts may often overlap, but I do not believe that an arrest under section 16–9–320 must be construed in exact parity with a Fourth Amendment seizure.

A Fourth Amendment seizure is always an *act*, never a process. *See California v. Hodari*, 499 U.S. 621, 629, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (holding the subject was only seized when he was tackled by an officer); *Brower v. County of Inyo*, 489 U.S. 593, 596–99, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) (stating a roadblock was a seizure as a seizure occurs "only when there is a governmental termination of freedom of movement *through means intentionally applied* ") (emphasis in original); *Thompson v. Whitman*, 18 Wall. 457, 85 U.S. 457, 471, 21 L.Ed. 897 (1873) (stating that, in a vessel seizure case, "[a] seizure is a single act, and not a continuous fact"); Black's Law Dictionary 1363 (7th ed.1999) (defining seizure as "[t]he act of an instance of taking possession of a person or property by legal right or process"). Conversely, as *State v. Dowd* instructs, the term "arrest" in section 16–9–320 contemplates a process. 306 S.C. at 270, 411 S.E.2d at 429.

Moreover, even a limited *Terry v. Ohio*[4] detention based on articulable suspicion constitutes a seizure under the Fourth Amendment. *See Brendlin v. California*, 551 U.S. ——, 127 S.Ct. 2400, 2405, 168 L.Ed.2d 132 (2007) (holding that "[a] person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, " 'by means of physical force or show of authority,' " terminates or restrains his freedom of movement") (quoting *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968))). Yet we all acknowledge that an individual fleeing from an attempted *Terry v. Ohio* detention would not constitute resisting arrest under section 16–9–320, for the element of arrest would be lacking. That scenario presents a Fourth Amendment seizure but not

---

4. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

an arrest under section 16–9–320. I therefore conclude that it is inappropriate to equate a Fourth Amendment seizure with the term "arrest" in section 16–9–320.

The majority has done a laudable effort in citing to statutes and case law from other jurisdictions. I see no reason to rely so heavily on the law of other jurisdictions. I believe our jurisprudence is sufficient to resolve this appeal. And if my reliance on South Carolina law, with its common law antecedents, for discerning the meaning of the statutory term "arrest" is misplaced, I believe our supreme court should resolve the matter and its concomitant policy implications.

I add one final observation that I believe supports my assessment of legislative intent of the term "arrest" in section 16–9–320. The Legislature created two separate offenses for resisting arrest. Brannon was convicted of violating subsection (A) of section 16–9–320, which makes it a one-year misdemeanor to merely resist arrest. The Legislature further enacted subsection (B) of section 16–9–320, which makes it a ten-year felony to assault an officer while resisting an arrest. Subsection (B) states:

> It is unlawful for a person to knowingly and wilfully ... assault, beat, or wound an officer when the person is resisting an arrest being made by one whom the person knows or reasonably should know is a law enforcement officer, whether under process or not. A person who violates the provisions of this subsection is guilty of a felony and, upon conviction, must be fined not less than one thousand dollars nor more than ten thousand dollars or imprisoned not more than ten years, or both.

Subsection (B) provides an enhanced penalty when a defendant assaults, beats, or wounds the arresting officer. It is in subsection (B) where we find the physicality component which is a feature of the majority opinion. Construing resisting arrest under the subsection (A) misdemeanor offense in line with the broad common law understanding of the term is a reasonable construction, and one that comports with the marked distinction given the separate offenses by the Legislature.

The majority's bright line approach of an actual, hands-on seizure would most assuredly facilitate application of section

16–9–320. Yet I believe such a formulaic approach would result in artificial distinctions not intended by the Legislature. Say, for example, a police officer has probable cause to arrest an individual and the suspect is aware of the officer's intent to arrest him. In one scenario, the officer approaches the suspect but the suspect flees as the officer's attempt to grab the suspect comes up inches short. In a second scenario, the same facts are present except the officer has a momentary grasp of the suspect before the suspect flees. Did the Legislature intend for the resisting arrest statute to apply in the second scenario but not the first? I think not. Moreover, a consideration of the facts of each case, as I propose, gives meaning to the holding in *State v. Williams* that an arrest may occur without the application of actual force or manual touching of the body. 237 S.C. at 257, 116 S.E.2d at 860.

In sum, I vote to affirm and adhere to my view that the reasoning of the majority opinion includes arguments never advanced by Brannon at trial or in his brief. I would affirm on issue preservation principles and the law of the case doctrine. I do address the substance of the majority opinion, albeit with reservation because of the policy implications involved. In voting to affirm the denial of the directed verdict motion, I would apply our resisting arrest statute to a fleeing suspect only in very narrow circumstances. As emphasized above, under the particular facts of this case, when objectively viewed, it is the presence of probable cause to believe that Brannon was committing a felony that gives rise to the application of the misdemeanor offense of resisting arrest under subsection (A) of 16–9–320. I would hold that a person violates section 16–9–320(A) irrespective of the lack of physical contact: (1) when a law enforcement officer, from an objective standpoint, has probable cause to believe a person has committed a crime; and (2) the law enforcement officer through words or actions makes known his intent to arrest or otherwise detain the person; and (3) the person, from an objective standpoint, recognizes the presence of a law enforcement officer and understands the intent of the officer to arrest him; and (4) the person attempts to avoid the arrest by impeding, hindering, or obstructing the law enforcement officer, by means of fleeing from the officer or other method of resisting or opposing the arrest. This initial offense would terminate

530

upon the full custodial arrest of the suspect or the suspension of the pursuit by the law enforcement officer.

Viewing the evidence and the reasonable inferences in a light most favorable to the State, I would find a jury question was presented as to the charge of resisting arrest under section 16–9–320(A). I would affirm the denial of the directed verdict motion.